George **KOROPOULOS**, et al.,
Appellants,

v.

**The CREDIT BUREAU, INC.**

No. 83–1782.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 27, 1984.
Decided May 4, 1984.

Stephen C. Glassman, Washington, D.C.,
with whom Alan D. Weinberger and Thom-

as B. Shull, Washington, D.C., were on the brief, for appellants.

Sheila J. Carpenter, Washington, D.C., with whom Michael S. Smith, Washington, D.C., was on the brief, for appellees.

Before WALD and MIKVA, Circuit Judges, and BAZELON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Plaintiffs, George and Katelina Koropoulos, appeal the district court's dismissal of their suit alleging that the Credit Bureau Incorporated of Georgia (CBI), violated the Fair Credit Reporting Act (FCRA or Act), 15 U.S.C. §§ 1681–1681t, by failing "to follow reasonable procedures to assure maximum accuracy" of credit reports it issued in response to inquiries on Mr. and Mrs. Koropoulos. The district court granted CBI's motion for summary judgment on the basis of facts it found uncontested: that the report CBI issued on Mr. Koropoulos was accurate and that CBI had issued no report on Mrs. Koropoulos. We find, however, that there are genuine issues of material fact as to whether the report on Mr. Koropoulos was accurate within the meaning of the FCRA. Additionally, we find there is a dispute as to whether CBI issued a report on Mr. Koropoulos in response to an inquiry about Mrs. Koropoulos' credit and thereby violated the Act. We therefore vacate the grant of summary judgment and remand the case for appropriate action by the trial court.

## I. BACKGROUND

On June 7, 1976, Mr. Koropoulos borrowed $2,034.92 from Virginia National Bank (VNB), to be paid off in twelve monthly installments beginning in July, 1976. Mr. Koropoulos subsequently defaulted on the loan; VNB charged the loan off as a bad debt and referred it to Nation-wide Credit Corporation (NCC) for collection. Mr. Koropoulos paid the loan in full to NCC, the final payment occurring in November, 1977. NCC kept a 40% collection fee on the payments by Mr. Koropoulos, and sent the remaining 60% of his payments to VNB.

In 1981, the Bank of Virginia denied Mr. Koropoulos' application for a credit card, allegedly on the basis of a credit report from CBI. At about the same time, Lord & Taylor turned down Mrs. Koropoulos' application for a credit card, also allegedly because of a credit report from CBI. Over the next few months Mr. Koropoulos was denied credit on a number of occasions; each time he claims that the lending institution mentioned a CBI credit report as the reason for denial.

In January, 1982, after plaintiffs' attorney contacted CBI, it disclosed Mr. Koropoulos' file to the plaintiffs. The file reported the VNB loan as having a current status of "I9" with a "0" balance. According to CBI's own definition, the "I9" status indicates that VNB either wrote the loan off as a bad debt, placed it for collection, instituted a civil suit against the debtor to collect it, or determined that the debtor "skipped" (*i.e.*, could not be located). The "0" balance indicates that the balance, as it appears on VNB's books, is zero.

On June 1, 1982, plaintiffs filed suit alleging that this characterization of the VNB loan was misleading because it indicated to potential creditors that VNB wrote the loan off as a total loss, and that Mr. Koropoulos never paid the debt. In fact, CBI knew in November 1977 that Mr. Koropoulos had paid off the loan in full. Less than a month later, CBI moved for summary judgment on the grounds that the information it reported on Mr. Koropoulos was entirely accurate and that it never issued a credit report on Mrs. Koropoulos. Plaintiffs contested both points. They attached an affidavit of an alleged "expert" in reading credit reports,[1] interpreting the "I9–0"

---

1. The expert, Gene Selbo, states he is a "supervisor of credit analysis at the Credit Recovery Bureau, Inc. of Alexandria, Virginia." Affidavit of Gene Selbo, Appendix to Brief of Appellants

status to mean that Mr. Koropoulos never repaid the loan. They also claimed that the circumstances under which Lord & Taylor denied Mrs. Koropoulos a credit card were far from clear and uncontested; in particular, plaintiffs pointed out that CBI's assertion that it never sent a report on Mrs. Koropoulos in no way disputes their allegation that it sent a report on Mr. Koropoulos, in response to a request about Mrs. Koropoulos, resulting in denial of a Lord & Taylor credit card to her.

The district court granted CBI's motion for summary judgment. It dismissed plaintiffs' claim based on the inaccuracy of the report on Mr. Koropoulos, stating that "Mr. Koropoulos fundamentally misunderstands the institutional arrangements underlying his 1976 VNB loan and the impact on his credit record of VNB's extraordinary measures in securing collection of the defaulted loan." *Koropoulos v. The Credit Bureau*, No. 82–1510, slip op. at 3 (June 23, 1983) (Memorandum Opinion) [hereinafter cited as *Memorandum Opinion*]. The district court held that the rating was accurate because VNB lost 40% of the money owed it due to its need to take collection measures. Thus, it concluded that the "9" rating—indicating a bad debt—was appropriate, and the "0" balance accurately reflected the balance on VNB's books. *Id.* at 5. It also dismissed Mrs. Koropoulos' claim based on the report issued to Lord & Taylor because "[a]t most, defendant provided the department store with accurate credit information regarding Mr. Koropoulos that caused the department store to deny a credit card for his wife." *Id.* at 7. This appeal from dismissal of plaintiffs' FCRA claims followed.

## II. THE VNB LOAN

### A. *The Accuracy Defense*

The FCRA requires that

[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

15 U.S.C. § 1681e(b). The Act further provides a cause of action by a consumer against

[a]ny consumer reporting agency or user of information which is negligent in failing to comply with any requirement imposed by this subchapter [the FCRA] with respect to any consumer ... [for] an amount equal to ... any actual damages sustained by the consumer as a result of the failure.

15 U.S.C. § 1681o(1). Read together, these provisions allow a consumer to bring suit for a violation of section 1681e(b) only if a credit reporting agency issues an inaccurate report on the consumer, since only then does harm flow from the agency's violation.[2]

Many cases construing section 1681e(b) have limited liability of credit reporting agencies to technically inaccurate reports— reports which include false information— and have dismissed actions where reports were factually correct but nonetheless misleading or materially incomplete. For example, one district court held that a report that the plaintiff had declared bankruptcy was accurate, within the meaning of section 1681e(b), despite its failure to mention that the consumer had withdrawn his bankruptcy petition and fully repaid his debts. *See McPhee v. Chilton Corp.*, 468 F.Supp. 494 (D.Conn.1978).[3] The district court here

at 63 [hereinafter cited as App.]. He claims to have "daily contact with consumer credit reports in general and the specific credit reports issued by ... CBI." *Id.*

**2.** *See Peller v. Retail Credit Co.*, Civ. No. 17900, slip op. at 4 (N.D.Ga. Dec. 6, 1973), *summary reprinted in* 5 CCH Cons.Cr.Guide ¶ 98,648 (if information is true, reasonable procedures would not have helped plaintiff get credit), *aff'd*, No. 74–1284 (5th Cir. Dec. 10, 1974) (no opin-

ion); *cf. Equifax v. Federal Trade Commission*, 678 F.2d 1047, 1051 (11th Cir.1982) (FTC argued that accuracy defense applies only to private suits since FTC, unlike private plaintiff, need not prove injury).

**3.** Other cases have dismissed section 1681e(b) actions using similar reasoning. *See, e.g., Todd v. Associated Credit Bureau Services, Inc.*, 451 F.Supp. 447, 449 (E.D.Pa.1977) (failure to report that plaintiffs had paid off debt which creditor

followed this line of cases in dismissing plaintiffs' claims. It noted that CBI clearly states, in explanations provided to its customers, that a classification of "9" applies to any debt charged off as a loss, referred for collection, requiring a civil action, or uncollectible because the debtor "skipped." *Memorandum Opinion* at 3–4. Mr. Koropoulos' loan was charged off as a bad debt by VNB, and therefore, the district court reasoned, came within CBI's classification of "9". *Id.* The district court also found that CBI "adjusted Mr. Koropoulos' credit report to reflect a '0' balance for the VNB loan," upon notification by VNB that the loan had been paid. *Id.* at 5–6. It considered the affidavit of plaintiffs' expert, attesting that the "9–0" designation would be read as indicating a total default on the loan, to be irrelevant because it found the report itself "totally accurate." *Id.* at 3.

■ First of all, we do not agree with the district court that section 1681e(b) makes a credit reporting agency liable for damages only if the report contains statements that are technically untrue. Congress did not limit the Act's mandate to reasonable procedures to assure only tech-

nical accuracy; to the contrary, the Act requires reasonable procedures to assure "maximum accuracy." The Act's self-stated purpose is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit ... in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." [4] 15 U.S.C. 1681e(b). Certainly reports containing factually correct information that nonetheless mislead their readers are neither maximally accurate nor fair to the consumer who is the subject of the reports.

The several district court cases adopting the technical accuracy defense to a section 1681e(b) claim fail to convince us that such a defense, applied to these facts, is in accord with congressional intent. These cases, which purport to follow *Peller v. Retail Credit Co.*, Civ. No. 17900 (N.D.Ga. Dec. 6, 1973), misread its rationale. In *Peller*, the plaintiff, a job applicant, took a lie detector test that revealed he had smoked marijuana. He was subsequently fired from a different job when his employ-

charged off as bad debt not inaccuracy), *aff'd mem.*, 578 F.2d 1376 (3d Cir.1978), *cert. denied*, 439 U.S. 1068, 99 S.Ct. 834, 59 L.Ed.2d 33 (1979); *Lowry v. Credit Bureau, Inc.*, 444 F.Supp. 541, 544 (N.D.Ga.1978) (confusion of reports on different people not inaccuracy); *Roseman v. Retail Credit Corp.*, 428 F.Supp. 643 (E.D.Pa.1977), 646 (failure to report plaintiff's denial of employer's explanation of his resignation not inaccuracy); *Austin v. BankAmerica Service Corp.*, 419 F.Supp. 730, 732 (N.D.Ga. 1974) (report that consumer was a defendant in a civil suit that failed to note consumer was sued in his official capacity as Deputy Marshall for DeKalb County not inaccurate); *Middlebrooks v. Retail Credit Co.*, 416 F.Supp. 1013, 1015–16 (N.D.Ga.1976) (report of plaintiff's arrest, which failed to record that plaintiff was released on bail and there was not yet a disposition on criminal charges not inaccurate); *but see Alexander v. Moore & Associates, Inc.*, 553 F.Supp. 948 (D.Haw.1982) (reporting failure to pay cleaning and repair costs to landlord as a "bad credit experience" led to section 1681e(b) liability because report was misleading); *Green v. Stores Mutual Protective Association*, 74–CIV.–4607 (S.D.N.Y. Oct. 3, 1975) (failure to explain circumstances behind confession of shoplifting—that plaintiff was 16 at time of alleged

theft, signed a standard confession form while in custody of private store's security personnel, and was never arrested or charged by public authorities—could result in liability under section 1681e(b)); *Miller v. Credit Bureau, Inc.*, [1969–1973 Transfer Binder] CCH Cons.Cr. Guide ¶ 97,173 at 89,068 (D.C.Super.Ct.1972) (bureau negligent, in part because it did not have procedures for ensuring that extenuating circumstances accompanying an adverse item would be reported); *cf. Peller*, slip op. at 3 (report of marijuana use was "accurate and true").

4. The purpose of the FCRA, as further elaborated in its legislative history, is "to protect consumers from being unjustly damaged because of inaccurate *or arbitrary* information in a credit report." S.Rep. No. 517, 91st Cong., 1st Sess. 1 (1969) (emphasis supplied). And, in introducing the fair credit reporting bill, Senator Proxmire said: "[p]erhaps the most serious problem in the credit reporting industry is the problem of inaccurate *or misleading* information." 115 Cong.Rec. 2411 (1969) (emphasis supplied). We think it clear that Congress meant the Act to address more than technically inaccurate reports.

er received a credit report indicating the marijuana use. The district court dismissed plaintiff's claim, alleging injury caused by the credit reporting agency's failure to independently verify the marijuana use, because he admitted that the reported marijuana use was true. In so doing, the court asked and answered the following question:

> Can a "consumer" pursue a willful or negligent theory of recovery against a "consumer reporting agency" who supplies a "user" with a consumer report containing adverse personal information about the "consumer" based upon the provision requiring the agency to "follow reasonable procedures to assure maximum possible accuracy of the information" when in fact the report itself is both accurate and true?
>
> The Court finds in the negative.

*Peller*, slip op. at 3. We have no difficulty with the result in *Peller* because, in fact, the report was neither misleading nor materially incomplete.

Several subsequent cases, however, have invoked the language of *Peller* to justify an absolute accuracy defense that precludes section 1681e(b) actions even where, unlike in *Peller*, the reports at issue are

misleading. To the extent these cases cite *Peller* and give no further rationale for invoking the defense, they are unpersuasive because *Peller* involved no claim that the information in the report, though technically true, was misleading or incomplete. We note as well that in some cases, the additional information necessary for clarification would have required the agencies to conduct further investigations, a burden that the courts may have considered unreasonable.[5] *See Alexander v. Moore & Associates, Inc.*, 553 F.Supp. 948, 951–52 (D.Haw.1982) [hereinafter cited as *Moore* ]. In this case plaintiffs do not complain about any failure on CBI's part to reinvestigate the VNB loan, or to update a file.[6] They claim rather that the manner in which CBI reported the information already in its possession was misleading. Thus, to the extent cases following *Peller* reflect a determination that Congress did not mean to impose any burden of reinvestigation on credit agencies, they have no bearing on this case.

In any event, we do not subscribe to the restrictive interpretation of "maximum accuracy" in the *Peller* line of cases; we find more in line with congressional intent and purpose the position taken in *Moore*:[7]

---

5. For example, *McPhee* characterized "[t]he precise issue [in that case to be] ... whether the Act imposes a requirement of updating information that was accurate when received." 468 F.Supp. at 495. *McPhee* involved a report stating that the plaintiff had filed for bankruptcy, but omitting additional information that the bankruptcy petition was later withdrawn and the plaintiff's debts paid. The court reasoned:

> By including such information the report might have been "more accurate than it was." ... But unless that information was available at the time the agency first learned that a petition for bankruptcy had been filed, *so that the agency could find the information in the reasonable process of verifying adverse material as received,* the agency could not be charged ... with a violation of § 1681e.

468 F.Supp. at 498 (quoting *Green*, slip op. at 12) (emphasis supplied). *See also Austin,* 419 F.Supp. at 732–33.

6. We have no cause to decide whether the Act imposes any duty to update report entries or to reinvestigate information adverse to consumers, since in this case CBI knew that Mr. Koropoulos

had repaid the loan when it issued its reports on him.

7. The *Moore* court and this court are not alone in finding the *Peller* line of cases unconvincing. Those cases have been universally criticized by commentators for taking an unjustifiably narrow view of the term "maximum accuracy." *See* Note, *Fair Credit Reporting: Are Misleading Reports Reasonable?* 55 N.Y.U.L.Rev. 111 (1980) ("[t]he *Peller* construction subverts the legislative intent of section 1681e(b)"); Note, *Judicial Construction of the Fair Credit Reporting Act: Scope and Civil Liability,* 76 Col.L.Rev. 458, 502 (1976) ("[s]ection 1681e(b) may be properly construed to require that reporting agencies take care to see that the information is not only factually correct but also not mitigated by attending circumstances"); *cf.* Comment, *The Fair Credit Reporting Act Amendments: Enforcement of the Legislative Trust,* 45 Miss.L.J. 95, 104–05 (1974) (Act's attempts to prevent erroneous and misleading reports may fail for lack of an effective enforcement mechanism); Note, *Protecting the Subjects of Credit Reports,* 80 Yale L.J. 1035, 1037–38 (1971) (injuries due to inac-

[S]ection 1681e(b) of the Act, fairly read, would apply to consumer reports even though they may be technically accurate, if it is shown that such reports are not accurate to the maximum possible extent. The inquiry however would not end there. The statute does not flatly require maximum possible accuracy, only that the consumer reporting agency must follow *reasonable procedures* to assure such accuracy. Thus, the determination of this issue would seem to involve a balancing test.

Under this approach, the court, in determining whether a violation of 1681e(b) has occurred, would weigh the potential that the information will create a misleading impression against the availability of more accurate [or complete] information and the burden of providing such information. Clearly the more misleading the information [*i.e.,* the greater the harm it can cause the consumer] and the more easily available the clarifying information, the greater the burden upon the consumer reporting agency to provide this clarification. Conversely, if the misleading information is of relatively insignificant value, a consumer reporting agency should not be required to take on a burdensome task in order to discover or provide additional or clarifying data, and it should not be penalized under this section if the procedures used are otherwise reasonable.

553 F.Supp. at 952 (emphasis in original).

■ Applying that interpretation in this case, we find that the district court's dismissal of the Koropoulos' claims by summary judgment on the grounds that the information in the report was technically accurate, regardless of any confusion generated in the recipients' minds as to what it meant, was improper. We find there is a genuine issue of fact as to whether the report was sufficiently misleading so as to raise the issue of whether CBI's procedures for assuring "maximum possible accuracy of reports may stem "from misleading or incomplete information" as much as "wholly

curacy" were reasonable. The affidavit of plaintiffs' expert stated that "the only reasonable interpretation of the Code [CBI's classification of the VNB loan] is that ... the creditor took a loss of $2182 on the account after the account was placed for collection." Affidavit of Gene Selbo at 4, App. at 66. It also impugned the affidavit of Janice Cummings, a CBI manager, as "not accurate in that it states that the Code signifies that plaintiff [Mr. Koropoulos] had fully paid off his account." *Id.* Were the plaintiffs' expert to be credited, the report could be found to be misleading, since in fact VNB did not take a total loss, and Mr. Koropoulos did repay the debt.

The district court should *not* resolve factual disputes of any moment on motions for summary judgment. The court is to grant the motion only if the undisputed facts and the reasonable inferences drawn therefrom, when viewed in the light most favorable to the party opposing summary judgment, support a ruling for the movant. In *Sears, Roebuck & Co. v. General Services Administration*, 553 F.2d 1378, 1382 (D.C. Cir.), *cert. denied*, 434 U.S. 826, 98 S.Ct. 74, 54 L.Ed.2d 84 (1977), this court held that the district court may not grant summary judgment where experts disagree about the "ultimate facts," even if those ultimate facts must be derived from uncontested basic facts. This case is similar to *Sears.* The plaintiffs' expert here has affirmed that the likely message of the credit report is detrimentally different from what actually occurred on the VNB loan, and that the report is therefore misleading. Summary judgment on the issue of whether the report was misleading is thus not appropriate at this juncture in the case. Indeed, it was granted by the district court on an altogether different theory which we reject— that the report was technically accurate.

### B. *Incomplete Credit Reports*

Plaintiffs also argue that even if the report on the VNB loan is not misleading, incorrect information").

CBI's classification system is so imprecise that, as a matter of law, it fails to constitute a reasonable procedure to assure maximum possible accuracy.[8] Brief for Appellant at 21–23. Specifically, they object to "CBI ... classif[ying] all adverse information into a single '9' category." *Id.* at 21. CBI relies on the explanation it gives its customers, which clearly states that a "9" rating means the "debtor failed to pay back a loan in a timely fashion and the creditor had to take extraordinary measures to collect the debt." Brief for Appellee at 9. The issue we must decide is whether using the classification "9" for all bad debts, whether ultimately paid or not, renders the report of the VNB loan sufficiently incomplete that plaintiffs may invoke the protection of section 1681e(b).

We must first determine whether section 1681e(b) requires credit reporting agencies to adopt procedures to reasonably assure that reports which are neither factually untrue nor misleading are also not incomplete. Essentially, plaintiffs contend that even where the reader of a report would be unlikely to infer an untruth, the Act mandates that the report must not omit any relevant information which it is reasonable

to include, *i.e.*, the report must be reasonably complete.

■ In introducing the bill which ultimately became the FCRA, Senator Proxmire reviewed the types of inaccuracy that can harm credit consumers. He explicitly addressed "[i]ncomplete information" as a type of inaccuracy distinct from misleading information,[9] stating that "[b]ecause of the increased computerization and standardization of credit bureau files, all of the relevant information is not always reflected in a person's files." 115 Cong.Rec. 2411 (1969). The conference report's explanation of section 1681e(b) is also a significant indicator that that section covers incomplete, as well as false and misleading reports.[10] That report states:

> The House conferees intend that this requirement [to follow reasonable procedures to assure maximum possible accuracy] shall include the duty to differentiate between types of individual bankruptcies (*e.g.*, between straight bankruptcies and chapter XIII wage earner plans), and that the disposition of a wage earner plan where the consumer conscientiously

---

**8.** CBI claims that plaintiffs "argue for the first time on appeal that ... use of the code term 'I9' is unreasonable as a matter of law," Brief for Appellee at 8, and that we should therefore not consider this issue. The breadth of the "I9" classification is, however, in our view, intimately related to plaintiffs' claim, which they have maintained throughout this case, that the classification is misleading and inaccurate. Only because of the breadth of the "I9" classification might CBI's customers understand a "0" balance to indicate that VNB took a total loss, rather than that Mr. Koropoulos repaid the loan after it was referred to NCC for collection.

Even if the claim based on the breadth of the "I9" classification were not related to plaintiffs' initial claim, we believe that on remand plaintiffs could amend their complaint to encompass this "new" claim. *See* Fed.R.Civ.P. 15. CBI moved for summary judgment 28 days after the plaintiffs filed suit, and a mere 5 days after it filed an answer to the complaint. *See* District Court Docket at 1, App. at i. The record does not reveal nor does it seem possible that CBI engaged in any extensive discovery or preparation for trial. Thus, allowing plaintiffs to raise a new issue at this early stage of litigation would not be unduly prejudicial. Since the

question whether CBI's "I9" classification is *per se* unreasonable is likely to arise on remand, we believe it is useful to discuss the legal standards by which such an issue should be measured in order to give the district court direction.

**9.** Senator Proxmire distinguished "[i]ncomplete information" from "[b]iased information." *See* 115 Cong.Rec. 2411 (1969). Under biased information, Senator Proxmire gave the example of "a record of slow or nonpayment," where the consumer has "a legitimate dispute with the merchant and [therefore] withheld payment." *Id.* Thus "biased information" is the same as misleading information—it causes the reader of the report to wrongfully believe that the consumer has failed to repay an undisputed debt. Under incomplete information, the Senator mentioned a report which failed to mention that the creditor had agreed to a slow payment due to "extenuating circumstances." *Id.*

**10.** "Perhaps the most useful document illuminating Congressional purpose is a Conference Report which bears on the final draft that is used by the conferees in explaining to the entire Congress why the bill should pass." *Vitrano v. Marshall,* 504 F.Supp. 1381, 1383 (D.D.C.1981).

carries out his responsibilities under it should be duly noted.

H.R.Rep. No. 1587, 91st Cong., 2d Sess. 29 (1970) (conference report), U.S.Code Cong. & Admin.News 1970, pp. 4394, 4415.[11] Thus, if a credit reporting agency were to report all bankruptcies under a single classification, it would violate section 1681e(b), even if it clearly stated that it so classified bankruptcies and thereby ensured that its credit reports were neither erroneous nor misleading. The situation with respect to defaulted loans is not qualitatively different. For this reason, we are inclined to believe that section 1681e(b) covers at least some types of incomplete information.

We are aware that a separate section in the Act explicitly deals with incomplete information. It provides that "[i]f the completeness or accuracy of any item of information ... is disputed by a consumer ...

the consumer reporting agency shall reinvestigate and record the current status of that information." 15 U.S.C. § 1681i. This section might suggest that Congress did not mean to include "incomplete information" within its definition of "inaccurate information" in section 1681e(b); it demonstrates that Congress recognized the differences between the two kinds of error. Nonetheless, we believe that Congress did not, in fact, intend to exclude altogether incomplete reports from section 1681e(b)'s requirement of reasonable procedures, as shown by the conference report.[12] The failure of section 1681e(b)'s language itself to specifically mention completeness in addition to accuracy may well be attributable to the fact that it was added so late in the legislative process that there was not time for careful semantic accommodation with earlier adopted provisions.[13]

**11.** Senator Bennett, a minority member of the conference committee, took exception to this explanation of section 1681e(b), stating on the Senate floor that "in the conference ... there was [no] indication that any conferee intended the amendment to include this type of requirement [to distinguish types of bankruptcies]." 116 Cong.Rec. 35942 (1970). Despite Senator Bennett's objections, the Senate as well as the House agreed to the conference report. Thus, Senator Bennett's single voice does not alter our view of the legislative intent behind section 1681e(b). As this court recently noted, "[s]tatements in a conference report, because commended to the entire Congress, carry greater weight than comments from floor debates by individual legislators." *Northern Colorado Water Conservancy Dist. v. Federal Energy Regulatory Comm.*, 730 F.2d 1509 (D.C.Cir.1984); *see also American Jewish Congress v. Kreps*, 574 F.2d 624, 629 n. 39 (D.C.Cir.1978).

**12.** Congressmen often used the words "accuracy" and "completeness" interchangeably during the congressional debates and hearings. *See, e.g.*, 115 Cong.Rec. 2411 (1969) (remarks of Sen. Proxmire); 116 Cong.Rec. 36569–73 (1970) (remarks of Rep. Sullivan); Fair Credit Reporting, Hearings on S. 823 Before the Subcomm. on Financial Institutions of the Senate Comm. on Banking and Currency, 91st Cong., 1st Sess. 33 ("I don't think that a report that is incomplete can be said to be accurate") (remarks of Sen. Bennett).

**13.** The fair credit reporting bill did not follow the usual route of full consideration by both

Houses; the previously passed Senate version was attached on the Senate floor as a rider to a House-passed bill on bank records and foreign transactions. Section 1681e(b) was later added in conference at the insistence of House conferees, who favored greater consumer protections than those the Senate bill provided. *See* 116 Cong.Rec. 38570 (1970) (statement of Rep. Sullivan reporting conference committee bill). In reporting the bill out of conference committee, Representative Sullivan stated:

> because in the final days of a Congress some legislative shortcuts sometimes have to be taken—a majority of the House conferees voted to offer amendments ... to bring the ... credit reporting bill ... into such form as we could in good conscience recommend them to the House as part of a conference report on H.R. 15073.

116 Cong.Rec. 36570 (1970).

There is an additional explanation why section 1681i might explicitly mention "incomplete information," while other sections of the Act do not. Section 1681i allows a consumer to dispute information in his file. It also explicitly provides, as a remedy, deletion of information "found to be inaccurate or [which] can no longer be verified." 15 U.S.C. § 1681i(a). Without more, this remedy might suggest that a consumer could dispute only "inaccurate" information capable of being deleted. Obviously, where a report is inaccurate due to omission of information (*i.e.*, is incomplete), deletion is of no use. In order to make clear that a consumer could correct a record on the grounds of incompleteness, the section explicitly mentioned incomplete reports.

■ ■ Having thus concluded that the FRCA imposes some duty on credit reporting agencies to assure their reports are not overly imprecise, we do not suggest that the Act requires all relevant credit information be included in agencies' reports: The Act only requires that agencies adopt reasonable procedures to ensure complete and precise reporting. *Cf. Moore*, 553 F.Supp. at 952 (discussing reasonable procedures to assure reports are not misleading). Imprecise or incomplete reports that are not misleading, although undesirable, are not as noxious as erroneous and misleading ones. The potential creditor is not misled; he is merely missing information which might be relevant to his decision whether to grant credit. Unlike the case of erroneous or misleading reports, the potential creditor can often correct inaccuracies himself by asking the credit applicants or the source to supply the missing information. Thus the likelihood that consumers will be harmed by incomplete reports that are neither misleading nor erroneous is less, and in many cases it may well be a "reasonable procedure" to let the potential creditor supplement the missing information himself.

The reasonableness requirement thus severely limits an agency's duty to maximally assure precise and complete reporting. Nevertheless, Congress apparently felt that, at some point, certain distinctions, such as those between bankruptcy and wage earner plans, may be so fundamental to the message credit report conveys that it is reasonable to place a burden on the credit reporting agency to report them. *See* H.R.Rep. No. 1587, 91st Cong., 2d Sess. 29 (1970).

■ Plaintiffs argue that lumping together all bad debts, ranging from loans totally paid off after referral for collection to flagrant defaults where the debtor has "skipped" town, is unreasonable, and that it is fundamental to the accuracy of a credit report under section 1681e(b) that such disparate circumstances be distinguished. CBI's explanation of its Code, which it gives to its customers, itself states that the "9" classification even includes debts that were not repaid because the debtor declared bankruptcy, *see* Affidavit of Eugenia A. Murray, Exhibit C, App. at 93; that would seem very much at odds with the section's purpose. In this case, the record is too sparse for us to conclude at this early stage in the proceeding either that CBI's "9" classification is so broad that it unreasonably fails to distinguish between fundamentally different credit histories, or that it is sufficiently narrow to be reasonable. The parties did not address the reasonableness of the "9" classification in the district court, and the record is therefore devoid of such evidence as: (1) the likelihood that a potential creditor would deny credit to an individual who has failed to pay back a loan, but would grant it to one who repaid the loan after the loan was referred for collection; and (2) the burden imposed on agencies by requiring a distinction between "skips," loans never repaid, loans repaid after referral for collection, and loans repaid only after civil suit is instituted. We therefore leave to the district court the determination whether the "9" classification is unreasonable *per se.*[14]

### III. THE LORD & TAYLOR CREDIT CARD

Plaintiff, Mrs. Koropoulos, also claims damages from Lord & Taylor's denial of her application for a credit card.[15] The

---

**14.** Even if it were decided that the "9" classification is so broad that it is unreasonable *per se,* plaintiffs must still prove that it caused them actual harm. We see no basis on this record for plaintiffs' claim that CBI violations of section 1681e(b) were intentional, and unless such proof is forthcoming, they would not be entitled to punitive damages for this part of their claim. *See* 15 U.S.C. § 1681n (punitive damages available for willful violation of the Act).

**15.** Plaintiffs supported their assertion with a letter in which Lord & Taylor notified them that it denied Mrs. Koropoulos credit because of a report by CBI. *See* App. at 68. CBI argues that we cannot consider the letter because it is hearsay, and not admissible at trial. Brief for Appellee at 7. *See Daily Press, Inc. v. UPI,* 412 F.2d 126, 133 (6th Cir.), *cert. denied,* 396 U.S. 990, 90 S.Ct. 480, 24 L.Ed.2d 453 (1969); *Zenith Radio Corp. v. Matsushita Elec. Ind. Co.,* 505 F.Supp. 1125, 1139 (E.D.Pa.1980). Because the FCRA

complaint alleges that this denial resulted from "adverse information contained in a consumer credit report supplied to Lord & Taylor, Inc. by CBI." Complaint at 6, App. at 6. The district court found that this assertion did not put into contest CBI's counter-assertion that it had no credit file on Mrs. Koropoulos, and that CBI at most provided Lord & Taylor with a report on Mr. Koropoulos, which the court found to be accurate.

■ We cannot sustain the dismissal of this claim either, because, even under the district court's assumption that CBI may have sent Lord & Taylor a report on Mr. Koropoulos, CBI may be liable to plaintiffs for violation of the FCRA. The Act addresses the confidentiality of credit information as well as the accuracy of credit reports. To protect confidentiality it provides that:

[a] consumer reporting agency may furnish a consumer report [only] ... [t]o a person which it has reason to believe—intends to use the information in connection with a credit transaction *involving the consumer on whom the information is to be furnished* and involving the extension of credit to, or review or collection of an account of, the consumer.

15 U.S.C. § 1681b(3)(A) (emphasis supplied).[16] The plain language of this provision seems to prohibit CBI from sending a report on Mr. Koropoulos in response to a request for a report on Mrs. Koropoulos. The issue is somewhat complicated, however, by the Act's definition of a consumer report as,

any ... communication bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used for ... purpose authorized under [15 U.S.C. § 1681b.

Thus, the Act seems to allow CBI to communicate information about Mr. Koropoulos as long as it has a bearing on Mrs. Koropoulos' credit worthiness; such a communication would not violate the Act because it would constitute a consumer report on Mrs. Koropoulos. *See Middlebrooks*, 416 F.Supp. at 1018 (providing information on spouse did not, in that instance, violate section 1681b); *cf. Morris v. Credit Bureau, Inc.*, 563 F.Supp. 962, 964 (S.D.Ohio 1983) (report of wife's pre-marriage bankruptcy in response to request for credit history of husband violated Act, once agency was on notice that the bankruptcy did not reflect husband's credit worthiness). In this case, however, CBI itself maintains that it issued a report on Mr. Koropoulos, *and not Mrs. Koropoulos*. And, as the record now stands, there is no indication that CBI reported only information that had a bearing on Mrs. Koropoulos' credit worthiness,[17] or that it had rea-

---

required Lord & Taylor to send this letter, *see* 15 U.S.C. § 1681m, we are less certain than CBI about its inadmissibility. *See United States v. Veytia-Bravo*, 603 F.2d 1187, 1188 (5th Cir.1979) (records required by law are admissible as routine business records under Fed.R.Evid. 803(6)), *cert. denied*, 444 U.S. 1024, 100 S.Ct. 686, 62 L.Ed.2d 658 (1980). Nonetheless, we need not rule on the admissibility of the letter since we do not rely on it in deciding this appeal.

**16.** The Act allows a credit reporting agency to furnish reports for several purposes other than extensions of credit, *see* 15 U.S.C. § 1681b, but as the record now stands, those provisions are inapplicable to this case.

**17.** As both the Federal Trade Commission and we read section 1681b(3)(A), "a consumer reporting agency may not report information from spouse A's file which relates only to his or her individual credit history when spouse B applies for credit." Division of Credit Practices, Bureau of Consumer Protection, Federal Trade Comm., Compliance With the Fair Credit Reporting Act 20.1 (2d ed. revised 1979). The problem arises, however, where information is "undesignated ... [*i.e.,* the] information [is] in a married consumer's file ... [and] was not reported to the consumer reporting agency with a designation indicating that the information relates to either the consumer's joint or individual credit experience." *Id.* We do not suggest that a consumer reporting agency is automatically liable if it supplies undesignated information on a consumer in response to a request for information about his or her spouse. Taking the ease or difficulty of verification into account, the agency need only act on a reasonable belief that the information bears on the credit worthiness of the spouse to be free from liability for a willful or negligent violation. *See* 15 U.S.C. §§ 1681n, o.

son to believe that Mrs. Koropoulos' application for a credit card in any way "involv[ed]" Mr. Koropoulos.[18] Given the silence of the record on whether Lord & Taylor requested a report on Mr. Koropoulos, on what information CBI actually furnished Lord & Taylor, and on whether CBI otherwise had reason to believe that Lord & Taylor contemplated a credit transaction with Mr. (as opposed to Mrs.) Koropoulos, summary judgment on this claim is inappropriate.

In addition to a possible claim under 15 U.S.C. § 1681b(3)(A), our conclusion that CBI's credit reports on Mr. Koropoulos may have been inaccurate under the Act also requires remand of Mrs. Koropoulos' Lord & Taylor credit card claim. If Lord & Taylor denied Mrs. Koropoulos a credit card because of inaccuracy in Mr. Koropoulos' report, that inaccuracy harmed her. We can see no logical reason why the mere fact that the harmful inaccuracy appeared in another individual's credit report should shield a credit reporting agency for harm to an individual flowing from a negligent violation of the Act.

### IV. Conclusion

We find that genuine issues of material fact exist with respect to whether (1) CBI negligently issued a misleading or incomplete report, in violation of 15 U.S.C. § 1681e(b), and (2) CBI negligently or willfully issued a report for an impermissible purpose, a violation of 15 U.S.C. § 1681b(3)(A). For the foregoing reasons we vacate the district court's grant of summary judgment for CBI, and remand for further proceedings consistent with this opinion.

*It is so ordered.*

---

18. This would be a different case if the record showed that CBI had knowledge that Mr. Koropoulos agreed or was legally obligated to satisfy Mrs. Koropoulos' unpaid debts.