[No. A100172. First Dist., Div. Five. Aug. 8, 2003.]

EVAN L. OLSON et al., Plaintiffs and Appellants, v.
SIX RIVERS NATIONAL BANK, Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II.A. and II.B.

## Counsel

Christopher G. Metzger and Ezra Eli Borntrager for Plaintiffs and Appellants.

The Harland Law Firm, Richard Smith and Geri Anne Johnson for Defendant and Respondent.

## Opinion

**STEVENS, J.**—Evan and Barbara Olson (the Olsons) appeal from a judgment entered after the trial court adjudicated three causes of action against them in a bench trial and granted respondent Six Rivers National Bank (Six Rivers) summary judgment on the remaining two causes of action. The

Olsons alleged that a customer of Six Rivers had fraudulently induced them to take out a loan from Six Rivers for the purpose of investing in the customer's company, which subsequently declared bankruptcy. They now contend the trial court erred by: (1) concluding the loan transaction was not subject to the California securities laws (e.g., Corp. Code, § 25401); (2) declining to rescind the transaction based on theories of concealment and failure of consideration; and (3) granting summary judgment on causes of action under the California Consumer Credit Reporting Agencies Act (Civ. Code, §§ 1785.1–1785.36).

We will affirm the judgment. ■ In the published portion of this opinion, we consider whether Six Rivers violated the California Consumer Credit Reporting Agencies Act by requesting credit information pertaining to Evan Olson (Evan) in connection with a loan to be made to Barbara Olson (Barbara). We conclude the bank's request was permissible under subdivision (a)(3)(A) and (F) of Civil Code section 1785.11.

## I. FACTS AND PROCEDURAL HISTORY

The Olsons sued Six Rivers for tort damages, declaratory relief, rescission, and violation of the California Consumer Credit Reporting Agencies Act (Credit Reporting Act). The trial court denied Six Rivers' motion to compel arbitration, yet stayed arbitration pending the outcome of the litigation. In an earlier appeal (appeal No. A088242), we affirmed the stay of arbitration and reversed in part the denial of the motion to compel arbitration. In particular, we held the tort damage claims were subject to the arbitration clause, while the equitable claims for rescission and declaratory relief, and the claims under the Credit Reporting Act, were not.

Upon remand, Six Rivers moved to bifurcate the equitable causes of action from the causes of action under the Credit Reporting Act. The court granted the motion and ordered the equitable causes of action tried first.

### A. BENCH TRIAL ON EQUITABLE CAUSES OF ACTION

The Olsons sought a judicial declaration that their loans from Six Rivers were illegal, particularly under the California securities laws.[1] They also sought rescission on the grounds of intentional misrepresentation, concealment, negligent misrepresentation, and failure of consideration. The evidence at trial included the following.

---

[1] Another declaratory relief claim, filed as the 13th cause of action in their third amended complaint, alleged that the loan transactions were in fact guarantee transactions. The trial court also rejected this claim. The Olsons do not challenge that decision.

In 1994, Six Rivers made a $100,000 SBA (Small Business Administration)–guaranteed start-up loan to Information Management Consultants (IMC), a medical transcribing business. Six Rivers loaned IMC an additional $60,000 in September 1995. In regard to these loans, Six Rivers dealt primarily with IMC partner Barbara Oliver (Oliver), who also had a personal account at the bank.

Oliver began dating Evan's cousin, and befriended the Olsons in January 1996.[2] Oliver discussed IMC with Barbara for some time, indicating that IMC was successful and was working on obtaining a "million-dollar contract" with Amador Hospital. In addition, Oliver stated, when IMC obtained the hospital contract it would hire Barbara as its executive director at a salary of $55,000 per year. The proposed salary at IMC was about $20,000 more than Barbara's salary as a postal window clerk.[3] Oliver did not tell Barbara that IMC was losing money and had outstanding loans from Six Rivers.

In March 1996, Six Rivers loaned IMC another $20,000. The following month, Oliver met with Six Rivers to obtain yet more funding. As memorialized in the notes of Six Rivers' junior loan officer Kelli Denney (Denney), Oliver provided financial projections indicating IMC would become profitable if it obtained at least one contract generating $15,000 more income. As of April 11, 1996, IMC's account at Six Rivers was overdrawn by $17,042.21, and Oliver's personal account was overdrawn by $5,018.54.

On April 12, 1996, Six Rivers loaned IMC approximately $55,000 as additional working capital. That same date, Six Rivers gave Oliver a $70,000 home equity loan, based on a house appraisal showing a value of $340,000. Oliver did not tell Six Rivers the house had never been built, however, and by the time Six Rivers discovered this problem through a title inspection, the funds had already been disbursed. Six Rivers later sold its interest in the property at a loss.

Oliver again met with Denney at Six Rivers on June 4, 1996, maintaining that IMC needed yet more money. IMC's financial reports showed total accounts payable of $98,335.45, $42,651.68 of which pertained to accounts older than 90 days. IMC had lost over $18,000 in April 1996 and over $19,000 in May 1996, and Denney did not believe IMC would improve financially. Nevertheless, based on Oliver's credit and repayment ability (and

---

[2] Oliver subsequently married Evan's cousin and is sometimes referred to in the record as Barbara Mitchell.

[3] Barbara testified: "[Oliver] told me that [IMC] was a very successful business, that she was in the process of procuring a contract with a hospital, I believe the name was Amador Hospital, and this was going to be a million dollar contract." "[T]hen once she secured this contract I could come on board, I could begin working once the contract was secured."

notwithstanding the incident with the "house" appraisal), Six Rivers extended a loan to Oliver, and Oliver signed the proceeds over to IMC. As of June 11, 1996, IMC's account at Six Rivers was overdrawn by more than $8,000.

On June 14, 1996, Oliver telephoned Barbara. Oliver asked Barbara to take out a loan at Six Rivers on behalf of IMC, explaining that IMC could not borrow money at the time and might close temporarily without an immediate cash infusion. According to Barbara, Oliver told her that Oliver—not Barbara— would be responsible for the loan payments.

While Barbara contends that Oliver first mentioned the loan idea on June 14 and rushed her into it that day, there was evidence Barbara had participated in Oliver's pursuit of the loan 10 days earlier. Six Rivers apparently received Barbara's personal financial statement, dated June 4, 1996, on a Six Rivers' form, on June 4, 1996. (Six Rivers obtained the Olsons' credit report on that date, and the Olsons' financial statement was the only source of the Social Security numbers required to order the report.) The evidence at trial suggested Oliver wrote much of the financial statement, but Barbara had signed it.

At any rate, on June 14, 1996, Six Rivers' senior lender, Gene Ulrich (Ulrich), instructed junior lender Tammy Brown (Brown) to prepare documents enabling Barbara to borrow $25,000. Denney was on vacation at the time. That same day, Barbara and Oliver met with Brown and Six Rivers' senior loan officer Susan Diehl-McCarthy (McCarthy), at the bank. Barbara was introduced as someone who was "going to come to work for IMC." She did not disclose her purported understanding that she would not be responsible for repaying the loan.

McCarthy had asked Brown to attend the meeting to make sure Barbara understood what she was doing and the risk she was taking by using the loan proceeds to invest in IMC. Meanwhile, McCarthy personally informed Barbara that IMC had a lot of potential. No one from Six Rivers told Barbara the specifics of IMC's financial condition, such as how much money it was losing, how much it owed the bank, or how much its account was overdrawn. Nor was it disclosed that some of the funds Barbara was to deposit into IMC's account would be used to make payments on Six Rivers' loans to IMC and cover IMC's overdrafts, or that all of IMC's assets were pledged to Six Rivers as collateral. According to Brown, Barbara was told IMC "was a young company that was struggling, and without this capital infusion, it was going to close its doors ...." In addition, McCarthy asked Barbara if Oliver

had told her everything about the business; Barbara, thinking she meant what services the business provided, rather than its financial condition, responded in the affirmative.[4]

Barbara executed a promissory note to Six Rivers for $25,000, to be repaid in two months. In return, she received a $25,000 cashier's check that same day, without any restriction on her use of the funds. With Brown's assistance, Barbara endorsed the check for deposit into IMC's account. Her purpose for borrowing the funds, she testified, was to sustain IMC financially so IMC could give her a job.

Brown thereafter prepared a file memorandum, memorializing the transaction. As the Olsons note, in part the memorandum stated: "This loan request for $25,000 was made to Barbara Olson personally for the purpose of investing into the Information Management Consultant company." But the Olsons ignore another portion of the memorandum, which stated: "At the time of loan document signing, present were Barbara Olson, Barbara Oliver, Susan Diehl McCarthy and myself, Tammy Brown. *We had a discussion about IMC in which Susan made very clear to Barbara Olson the weak financial condition of the IMC company. Ms. Olson reiterated that she understood the financial status of the company and was very aware that her investment was at risk, but it was a risk that she was wanting to take.*" (Italics added.)

Upon her return from vacation, Denney signed the loan documents on Six Rivers' behalf. Of the $25,000 Barbara deposited into the IMC account, over $7,000 was used to pay down IMC's or Oliver's outstanding indebtedness to the bank. Oliver transferred $15,000 to her personal account. The Olsons did not retain any of the proceeds.

On September 26, 1996, IMC filed a voluntary bankruptcy petition, listing assets of $21,000 and liabilities of $339,111.83. The next month, Oliver initiated a $35,000 loan from Six Rivers to the Olsons, for $10,000 plus $25,000 to pay off the June 14 loan. According to Barbara, Six Rivers' senior lender, Ulrich, told her IMC had the potential to be a million dollar business and it was so easy to run the business even he could do it. Based on this comment, Evan believed IMC was a good business as well. He was not told of IMC's monthly losses or overdue accounts payable.

Six Rivers sold the IMC assets in November 1996, advising the purchaser of IMC's overdrafts and the fact that all of IMC's assets were collateral for

---

[4] McCarthy further testified at trial that she informed Barbara that the funds could be used by IMC for any purpose, IMC was "in trouble," and "it would be solely her decision to invest money in that company." But in her deposition, McCarthy had been unable to recall any such discussions.

Six Rivers loans. In July 1998, Oliver filed her own bankruptcy petition. Her former business partner asserted at trial that she was habitually dishonest and untruthful.

Banking expert Wayne Shaffer opined that Six Rivers' actions in connection with the June 14 loan did not meet industry standards. In 20 years as a lending officer, Shaffer testified, he had never approved a loan like the June 14 loan to Barbara. Also, according to Shaffer, Six Rivers had a conflict of interest in the transaction, violated its own lending policies and standards, improperly used Oliver as an intermediary by allowing her to complete Barbara's loan application documents and deliver them to the bank, and represented to Barbara that IMC had a lot of potential, even though its financial condition made it extremely unlikely IMC would survive. Shaffer further offered that Six Rivers assumed the role of investment advisor to Barbara, with a duty of full disclosure, yet failed to adequately disclose IMC's financial condition.

The court issued a memorandum of tentative decision rejecting the Olsons' claims, and the Olsons requested a formal statement of decision. The court entered its statement of decision on December 27, 2001.

## B. *SUMMARY JUDGMENT ON CLAIMS UNDER THE CONSUMER CREDIT REPORTING ACT*

After prevailing at the bench trial, Six Rivers filed a motion for summary judgment as to the Olsons' remaining two causes of action under the Credit Reporting Act. As discussed further *post*, the motion was granted. Judgment was entered, and this appeal followed.

## II. DISCUSSION

As mentioned, the Olsons contend the June 14 promissory note was an illegal contract, the note should have been rescinded, and summary judgment should not have been granted as to their claims under the Credit Reporting Act. They fail to establish reversible error.

### A., B.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## C. *CREDIT REPORTING ACT (FIRST & SECOND CAUSES OF ACTION)*

As relevant here, the Credit Reporting Act limits the dissemination of consumer credit information. In their first and second causes of action, the

---

[*]See footnote, *ante*, page 1.

Olsons claimed that Six Rivers improperly accessed Evan's credit file when evaluating Barbara's creditworthiness for the June 14 loan. We begin our analysis of the court's grant of summary judgment on these claims with a brief discussion of pertinent provisions of the Credit Reporting Act.

### 1. The Credit Reporting Act

Under Civil Code section 1785.3, subdivision (c), a "consumer credit report" is "any written, oral, or other communication of any information by a consumer credit reporting agency bearing on a consumer's creditworthiness, credit standing, or credit capacity, which is used or is expected to be used, or collected in whole or in part, for the purpose of serving as a factor in establishing the consumer's eligibility for: (1) credit to be used primarily for personal, family, or household purposes, or (2) employment purposes, or (3) hiring of a dwelling unit, as defined in subdivision (c) of Section 1940, or (4) other purposes authorized in Section 1785.11." The parties do not dispute that the joint credit report obtained by Six Rivers on the Olsons (including the information corresponding to Evan in particular) constituted a credit report within the meaning of Civil Code section 1785.3.

■ Civil Code section 1785.11 limits the circumstances in which a consumer credit reporting agency may *furnish* a consumer credit report. As potentially relevant here, a consumer credit reporting agency could furnish Evan's credit information: pursuant to Evan's written instructions (Civ. Code, § 1785.11, subd. (a)(2)); or for use in connection with a credit transaction involving the extension of credit to the consumer—Evan or, as we shall see, Barbara (Civ. Code, § 1785.11, subd. (a)(3)(A)); or for the bank's legitimate need in connection with a business transaction "involving" Evan (Civ. Code, § 1785.11, subd. (a)(3)(F)). The report may be furnished pursuant to Civil Code section 1785.11, subdivision (a)(3)(A) "where it is a credit transaction that is not initiated by the consumer" if the "consumer authorizes the consumer credit reporting agency to furnish the consumer credit report to the person." (Civ. Code, § 1785.11, subd. (b)(1).)

■ A person (or bank) who *obtains* a consumer credit report for purposes other than those approved in Civil Code section 1785.11 may be held liable for damages or a civil penalty pursuant to Civil Code sections 1785.19 and 1785.31. The Olsons alleged that Six Rivers became liable under these provisions.

### 2. The Summary Judgment Motion

In its motion for summary judgment, Six Rivers asserted the following as undisputed material facts: (1) the trial court had already determined at trial

that the loan was not illegal, Oliver was not Six Rivers' agent, and the bank had not committed intentional or negligent misrepresentation or concealed facts; (2) the personal financial statement submitted on Barbara's behalf was signed by Barbara and contained certain provisions; and (3) the bank obtained a joint credit report on the Olsons using the Social Security numbers written on the financial statement.

In ruling on the motion, the trial court relied on the personal financial statement executed by Barbara.[12] Towards the top of page one, the financial statement read: "If you live in a community property state your personal financial statement should include information about your spouse. If he or she is not a co-applicant for this loan, his or her separate property need not be included. Unless you indicate otherwise, Six Rivers National Bank will assume that all property listed is community property and that all debts listed for you or your spouse are community obligations." In the statement of her financial condition, numerous assets were identified as "JT" (joint tenancy) property. The financial statement also set forth employment information and income for both Barbara and Evan. Near Barbara's signature on the last page, the personal financial statement read in part: "I (we) *authorize* Six Rivers National Bank to verify or check any of the information given, check credit references, verify employment, and obtain *one or more credit reports in connection with this credit application* or in connection with any periodic review of any loans or credit which may be extended to me (us). *If I am married and live in a community property state, this authorization is also made on behalf of my spouse even if he or she is not a co-applicant.*" (Italics added.)

In her declaration opposing the summary judgment motion, Barbara acknowledged that the signature on the financial statement was hers, but denied writing the other information on the statement, including the Social Security numbers. Barbara also asserted that Evan had not authorized her to consent to the release of his credit information. In his declaration, Evan averred that he never consented or authorized Barbara to consent to the accessing of his credit information.

The trial court granted summary judgment, relying on Civil Code section 1785.11, subdivision (a)(3)(F), which allows a credit report to be furnished where a party has a legitimate need for the information in connection with a business transaction involving the consumer. The court explained: "Barbara

---

[12] The sole evidentiary support for the bank's assertions of fact was the declaration of its attorney. The trial court sustained the Olsons' hearsay objection to those portions of the declaration corresponding to undisputed facts 2 and 3, but noted that the personal financial statement was "already in evidence" from the trial (as defendant's exhibit A) and would be relied upon by the court.

Olson asked for a loan from the Bank and provided a signed financial information statement in connection with the loan. Although the loan was made in her name alone, the financial statement included information on Evan Olson. [] California is a community property state. As Barbara Olson acknowledges in her declaration, the Bank relied on her husband's credit worthiness for the loan. [] Following a lengthy court trial, the Court has already found that this loan transaction was valid and enforceable. [¶] The Bank had a legitimate business need for the credit information obtained on Barbara and Evan Olson in connection with the loan transaction. Spousal information in connection with a loan application by one spouse does not violate the Credit Reporting Act as long as it has a bearing on the applicant's credit worthiness. [Citations.] Neither the Federal or California Act make obtaining consumer credit information from a credit reporting agency unlawful when the information is needed in connection with a business transaction involving the consumer. Since this is a community property state, and wages and other joint assets were to be relied upon for credit worthiness, the Bank had a legitimate business need for Evan Olson's credit information in connection with the loan to Barbara Olson."

3. *Analysis*

■ In reviewing the grant of summary judgment, we conduct an independent review to determine whether there are triable issues of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Buss v. Superior Court* (1997) 16 Cal.4th 35, 60 [65 Cal.Rptr.2d 366, 939 P.2d 766]; *Ochoa v. Pacific Gas & Electric Co.* (1998) 61 Cal.App.4th 1480, 1485 [72 Cal.Rptr.2d 232].) We construe the moving party's evidence strictly, and the nonmoving party's evidence liberally, in determining whether there is a triable issue. (See *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 20 [112 Cal.Rptr. 786, 520 P.2d 10].) ■ A defendant seeking summary judgment must show that at least one element of the plaintiff's cause of action cannot be established, or that there is a complete defense to the cause of action. (Code Civ. Proc., § 437c, subd. (o)(2).) The burden then shifts to the plaintiff to show there is a triable issue of material fact on that issue. (See Code Civ. Proc., § 437c, subd. (p)(2); *Jambazian v. Borden* (1994) 25 Cal.App.4th 836, 843–844 [30 Cal.Rptr.2d 768].)

Based on the evidence provided by Six Rivers—namely, the signed personal financial statement itself—the bank established that its request for Evan's credit information was for a purpose authorized under Civil Code section 1785.11, subdivision (a). On its face, the financial statement set forth property the Olsons held jointly, and thus indicated that Barbara was relying on joint or community property in establishing her creditworthiness for the

loan. As the trial court ruled, Six Rivers sought and obtained Evan's credit information out of a "legitimate business need for the information in connection with a business transaction involving the consumer"—in this case, Evan. (Civ. Code, § 1785.11, subd. (a)(3)(F).) The "business transaction"—the loan to Barbara based on the Olsons' *joint* property—"involved" Evan because it was predicated at least in part on Evan's creditworthiness. In fact, the community estate could be liable for the loan, even if only Barbara was party to it. (See Fam. Code, § 910.) Consequently, Six Rivers' request for Evan's credit information was authorized by Civil Code section 1785.11, subdivision (a)(3)(F).

A somewhat different approach, though also supporting the result reached by the trial court, has been applied under the federal counterpart of Civil Code section 1785.11, subdivision (a)(3)(A). Both the federal and state versions of this provision permit the furnishing of consumer credit information if the information is intended to be used in connection with a credit transaction "involving the consumer as to whom the information is to be furnished and involving the extension of credit to ... the consumer." (*Ibid.*; 15 U.S.C. § 1681b(a)(3)(A).) ■ Because the Credit Reporting Act is substantially based on the Federal Fair Credit Reporting Act (15 U.S.C. §§ 1681–1681t), judicial interpretation of the federal provisions is persuasive authority and entitled to substantial weight when interpreting the California provisions. (*Kahn v. Kahn* (1977) 68 Cal.App.3d 372, 387 [137 Cal.Rptr. 332].)

In *Koropoulos v. Credit Bureau, Inc.* (D.C. Cir. 1984) 236 U.S. App. D.C. 136 [734 F.2d 37] (*Koropoulos*), a husband and wife sued a credit reporting agency for, among other things, providing adverse credit information of the husband to a credit card company considering a credit card application of the wife. At issue was whether the furnishing of this credit information was permissible under title 15 United States Code section 1681b, in that the information was intended to be used in connection with a credit transaction involving the consumer on whom the information was to be furnished. The court stated: "The plain language of this provision seems to prohibit [the credit reporting agency] from sending a report on Mr. Koropoulos in response to a request for a report on Mrs. Koropoulos. The issue is somewhat complicated, however, by the Act's definition of a consumer report as [¶] 'any ... communication bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used for ... a purpose authorized under [15 U.S.C. § 1681b].' [¶] Thus, the Act seems to allow [the credit reporting agency] to communicate information about Mr. Koropoulos as long as it has a bearing on Mrs. Koropoulos' credit worthiness; such a communication would not violate the Act because it would constitute a consumer report on *Mrs.* Koropoulos." (*Koropoulos, supra*, at p. 46, italics added.)

Applying *Koropoulos* to the present matter, the language of Civil Code section 1785.11, subdivision (a)(3)(A), like its federal counterpart, might initially appear to prohibit obtaining a report on Evan in regard to a credit transaction involving only Barbara. As with title 15 of the United States Code, section 1681b, however, the issue is complicated by the Credit Reporting Act's definition of a consumer credit report as a communication *"bearing on* a consumer's credit worthiness." (Civ. Code, § 1785.3, subd. (c), italics added.) Evan's credit history had a bearing on Barbara's creditworthiness, because Barbara relied on community assets to establish her creditworthiness. Evan's credit information therefore effectively constituted a consumer credit report on *Barbara*, who expressly authorized the credit report. The bank's request for his credit information was thus authorized under Civil Code section 1785.11, subdivision (a)(3)(A).

The Olsons fail to raise a triable issue of material fact. Although they point to evidence that Oliver filled in the Social Security numbers and other parts of the financial statement rather than Barbara, it is nevertheless undisputed that Barbara *signed* the financial statement, which authorized the credit report: "I (we) *authorize* Six Rivers National Bank to verify or check any of the information given, check credit references, verify employment, and obtain *one or more credit reports in connection with this credit application* or in connection with any periodic review of any loans or credit which may be extended to me (us). *If I am married and live in a community property state, this authorization is also made on behalf of my spouse even if he or she is not a co-applicant.*" (Italics added.)[13]

The Olsons advance a further claim: even if Barbara's consent permitted Six Rivers to access Evan's credit file, her consent became "void" when Oliver filled in the personal financial statement after Barbara signed it and before delivering it to Six Rivers. In this regard, the Olsons rely on *California Savings etc. Bank v. Wheeler* (1932) 216 Cal. 742 [16 P.2d 737] (*Wheeler*) and *Nissen v. Ehrenpfort* (1919) 42 Cal.App. 593 [183 P. 956] (*Nissen*). Neither *Wheeler* nor *Nissen* supports the Olsons' position.

*Wheeler* involved the alteration of a mortgage document to change the interest rate and the description of the covered property. Relying on Civil Code section 1700, the court ruled that a person who intentionally destroys or alters a written contract extinguishes all the contractual obligations in his

---

[13] The Olsons contend that Barbara had neither actual nor ostensible authority to consent to the accessing of Evan's credit file. But the legality of the bank's request for Evan's credit information does not necessarily turn on whether Barbara had authority to consent to the release of *his* credit information, but on whether Six Rivers legitimately requested his credit information when evaluating her creditworthiness pursuant to Civil Code section 1785.11, subdivision (a)(3)(A) or (F). For reasons discussed *ante*, it did.

favor. (*Wheeler, supra,* 216 Cal. at p. 746.) In the present case, however, the personal financial statement was not a contract between Barbara and the alterer, Oliver. And even if Civil Code section 1700 applied, Oliver's alteration of the document would only extinguish Olson's obligations *to Oliver.* Because the trial court found Oliver was not Six Rivers' agent, Oliver's acts cannot be attributed to Six Rivers. *Wheeler* is inapposite.

*Nissen,* involving the alteration of a negotiable instrument, is inapposite as well. There, the court ruled, a surety is exonerated of its obligations under Civil Code section 2819 upon the creditor's alteration of the instrument without the surety's consent. (*Nissen, supra,* 42 Cal.App. at p. 595.) In the matter before us, however, Barbara was not a surety, and the personal financial statement was not a negotiable instrument. Thus, *Nissen* is not helpful to our analysis.

Nor is the Olsons' reliance on *Morris v. Credit Bureau of Cincinnati, Inc.* (S.D. Ohio 1983) 563 F.Supp. 962 helpful to their claim. In *Morris,* a defendant credit reporting agency learned it had erroneously attributed to the plaintiff husband a bankruptcy of the plaintiff's wife, which had occurred before their marriage. (*Id.* at pp. 964–965.) After the credit reporting agency learned of this error, it opened a new file on the plaintiff, which contained the same error. (*Id.* at p. 965.) The court found that the credit reporting agency had negligently failed to follow reasonable procedures to assure the maximum possible accuracy of the plaintiff's credit information. (*Id.* at p. 967.) Contrary to the Olsons' suggestion, the court did not predicate its decision on a determination that the wife's premarriage bankruptcy had no bearing on her husband's creditworthiness. (See *id.* at pp. 966–967.)

Lastly, the Olsons assert that Six Rivers' Ulrich testified in deposition that under proper banking procedures, when contemplating a loan to only one spouse, the bank should not access the credit file of the non-borrower spouse. Actually, Ulrich merely testified it was *the policy at Six Rivers* to request credit information on only the spouse who was requesting the credit; he did not opine as to the operation of the Credit Reporting Act. At any rate, the legal interpretation of the Credit Reporting Act in this case is not a matter for Ulrich, but a matter of law for the court.

The Olsons have failed to establish error in the court's grant of summary judgment.[14]

---

[14] The Olsons assert that, because the California Constitution provides a right of privacy, under California law "there is authority to believe that the literal language of [Civil Code] section[s] 1785.19 and 1785.11 cannot be read in the watered down fashion urged by defendant in its motion for summary judgment." We find this argument incomprehensible; at the very least, the Olsons have not established entitlement to a reversal on this ground.

## III. DISPOSITION

The judgment is affirmed.

Jones, P. J., and Simons, J., concurred.