936 F.2d 1151
 Richard A. CAHLIN, Plaintiff-Counterdefendant-Appellant,
v.
GENERAL MOTORS ACCEPTANCE CORPORATION, Defendant-Counterclaimant,
TRW, Inc., the Credit Bureau Incorporated of Georgia,
Defendants-Appellees.
 No. 89-6179.
 United States Court of Appeals,
Eleventh Circuit.
 July 25, 1991.
 
 Adam H. Lawrence, Lawrence & Daniels, Miami, Fla., for Cahlin.
 Karen L. Trafford, G. Morton Good, Miami, Fla., for the Credit Bureau Inc.
 Sanford L. Bohrer, Steven W. Davis, R. Marcus Cobourn, Miami, Fla., for TRW, Inc.
 Earl D. Waldin, Jr., Kelley, Drye & Warren, Miami, Fla., for defendants-appellees.
 Appeal from the United States District Court for the Southern District of Florida.
 Before CLARK, Circuit Judge, HILL* and COFFIN**, Senior Circuit Judges.
 CLARK, Circuit Judge:
 
 
 1
 Plaintiff-appellant Richard A. Cahlin brought suit against defendant-appellees TRW, Inc. and The Credit Bureau Incorporated of Georgia (CBI), alleging negligent and willful noncompliance with various provisions of the Fair Credit Reporting Act (FCRA).[1] After this case was removed from state court, the district court granted summary judgment in favor of TRW and CBI on the ground that Cahlin had failed to satisfy his threshold burden of showing that the credit agencies had reported any "inaccurate" information. Specifically, the district court held that the undisputed facts revealed that both CBI and TRW had accurately reported information concerning Cahlin's credit record as instructed from time-to-time by one of Cahlin's creditors. The district court further found that Cahlin had failed to satisfy his burden of coming forward with sufficient evidence showing that he has been damaged by being denied credit as a result of a TRW credit report. We affirm, although on slightly different grounds than those relied upon by the district court.
 
 I.
 
 2
 On June 3, 1985, Cahlin leased a car for a five-year term from General Motors Acceptance Corporation (GMAC). The lease agreement provided that the lessee would be liable for any deficiencies resulting from early termination of the agreement. Cahlin, however, alleged that he received an oral promise from the salesperson that if he returned the car within 90 days, he would be relieved of any further financial obligations under the lease. Cahlin voluntarily returned the car to GMAC on August 27. GMAC sent notices in both November and December stating that Cahlin owed $3,842.44 on the lease and threatened legal action, but Cahlin disputed his liability for this amount. Cahlin settled his dispute with GMAC's collection attorney in January, 1986 by promising to pay $2,000 as full satisfaction for his outstanding indebtedness. Pursuant to this settlement agreement, Cahlin completed payment of this sum by May 1, 1986 and received a general release from GMAC that discharged him from all debts previously owed.
 
 A. CBI's Reporting of Cahlin's GMAC Account
 
 3
 In August, 1985, GMAC began reporting to CBI that Cahlin's account was delinquent, and in December, GMAC further reported that the account had been charged off its books as an active receivable. As a result, CBI reported the GMAC account in Cahlin's credit report as having an "I9" rating with a balance due of $3,843.44. An "I9" rating signifies that the account has been charged off or is a bad debt.
 
 
 4
 After Cahlin satisfied the terms of the settlement agreement and received a general release, GMAC informed CBI by letter on June 16, 1986 that "[w]e previously reported a loss on the above mentioned account. The loss has now been paid in full, thus liquidating the balance on the account. We would appreciate your marking your file accordingly." In response to that letter, CBI changed the GMAC tradeline on Cahlin's credit file to a zero balance, but continued to carry an "I9" rating. In August, 1986, Cahlin received a current copy of his credit report from CBI and mailed a customer dispute form on August 20 in which he stated that his debt to GMAC had been paid in full. He also attached a copy of the general release from GMAC. Although this dispute form was received by CBI, it took no action on it other than to send him a copy of his credit report. This report dated September 11, 1986 shows that the GMAC account continued to carry the "I9" rating and a zero balance.
 
 
 5
 As a result of complaints from Cahlin, GMAC sent a letter to CBI on October 9, 1986, directing it to "change the rating on [Cahlin's] account from I-9 to I-1." An "I-1" rating signifies that a debt is paid within 30 days of billing. In response to this letter, CBI reported the current status of Cahlin's GMAC account as having an "I-1" rating, but relocated the "I-9" reference to the section of the report documenting Cahlin's previous credit history. The previous history section now reflected that GMAC had reported Cahlin as an "I-9" rating in June, 1986.
 
 
 6
 One year later on October 12, 1987, Cahlin sent a letter to CBI requesting that it remove the "I9" rating from the previous history section of his GMAC account. CBI subsequently called GMAC on October 28 and, upon instructions from GMAC, changed Cahlin's report by deleting any reference to an "I9" rating. By November 3, 1987, CBI ceased reporting any derogatory information concerning the GMAC account on Cahlin's credit report.
 
 
 7
 As a result of this negative credit information reported by CBI, Cahlin alleges that he was damaged by being denied credit on numerous occasions between the time of the October 9, 1986 GMAC letter to CBI and the final correction of his credit report on November 3, 1987.
 
 B. TRW's Reporting of Cahlin's GMAC Account
 
 8
 Although the record does not show how TRW initially reported Cahlin's GMAC account, TRW, prior to June, 1986, evidently reported Cahlin's account to be a "loss charge off". In that month, however, the parties agree that GMAC instructed TRW to change Cahlin's account to a "paid charge off". After complaints by Cahlin in August that TRW was not reporting his satisfaction of the GMAC account, GMAC directed TRW on September 4, 1986 to change the reporting of the GMAC account to a "Code 13" which represents a paid account with a zero balance and is not considered a derogatory rating.
 
 
 9
 On October 16, 1986, TRW received a letter from Cahlin requesting that TRW verify the status of his account with GMAC. On that same day, TRW telephoned GMAC to verify whether GMAC wanted the "paid charge off" notation changed to "paid satisfactory." TRW processed this change through its computer records on October 21, 1986, and all credit reports issued after that date reflect that Cahlin's GMAC account was "paid satisfactory".
 
 
 10
 Between September 4 and October 21, 1986, Cahlin alleges that he had a residential mortgage loan application pending at First Nationwide Bank and avers that this application was denied as a result of a TRW credit report containing derogatory credit information concerning his GMAC account. Cahlin produced no documentary or testimonial evidence to support these allegations. TRW, however, subpoenaed the records of First Nationwide, and those documents provide no indication that a TRW report was a factor in this denial. TRW also produced an affidavit from Betty J. Del Place--a First Nationwide employee who Cahlin claimed he dealt with on his application--that also did not support Cahlin's allegations.
 
 II.
 
 11
 Cahlin claims that CBI and TRW allegedly violated two separate duties of care imposed by Congress on credit reporting agencies in the Fair Credit Reporting Act. Under section 607(b) of the Act, a credit reporting agency, when preparing a credit report on a consumer, is required to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."[2] In addition, if a consumer brings a dispute to the agency as to the completeness or accuracy of a credit report, the agency is required by section 611(a) "within a reasonable period of time [to] reinvestigate and record the current status of that information unless it has reasonable grounds to believe that the dispute by the consumer is frivolous or irrelevant."[3] As part of its enforcement mechanism, the Act creates a private right of action against credit reporting agencies for negligent or willful violation of these or other duties imposed by this legislation.[4]
 
 A. CBI
 1. Duty to Follow Reasonable Procedures
 
 12
 In order to make out a prima facie violation of section 607(b), the Act implicitly requires that a consumer must present evidence tending to show that a credit reporting agency prepared a report containing "inaccurate" information.[5] If he fails to satisfy this initial burden, the consumer, as a matter of law, has not established a violation of section 607(b), and a court need not inquire further as to the reasonableness of the procedures adopted by the credit reporting agency.[6] The Act, however, does not make reporting agencies strictly liable for all inaccuracies.[7] The agency can escape liability if it establishes that an inaccurate report was generated by following reasonable procedures,[8] which will be a jury question in the overwhelming majority of cases. Thus, prior to sending a section 607(b) claim to the jury, a credit reporting agency can usually prevail only if a court finds, as a matter of law, that a credit report was "accurate".
 
 
 13
 Although courts have assumed that the so-called "accuracy defense"[9] is a question fit for disposition on motion for summary judgment, they have widely diverged in their interpretations of what constitutes an "accurate" credit report. Accuracy is quite clearly not a self-defining concept, and FCRA's fragmentary legislative history provides little, if any, guidance as to how Congress intended this standard to be applied.[10] As a result, two differing judicial perspectives on section 607(b) have developed. Under the approach implicitly adopted by the district court in this case, a plaintiff has failed to carry his initial burden if a court finds that the information contained in a challenged credit report was accurate on its face, or, put somewhat differently, "technically accurate." That is, a credit reporting agency satisfies its duty under section 607(b) if it produces a report that contains factually correct information about a consumer that might nonetheless be misleading or incomplete in some respect.[11]
 
 
 14
 For example, in Todd v. Associated Credit Bureau Servs., Inc.,[12] a department store charged off the balance on plaintiff's account to profit and loss and assigned the account to a collection agency. Although the plaintiff eventually paid off the balance of the account to the collection agency, the plaintiff's credit report only showed the high balance of the account; that the store had charged off the balance as a bad debt; and that this sum had been referred to a collection agency. The fact that the debt was later paid in full was never reflected in the credit report.[13] On a motion for summary judgment, the Todd court held, however, that the credit reporting agency had not breached its duty under section 607(b) because the information that was actually reported was "unquestionably accurate."[14]
 
 
 15
 In contrast, the District of Columbia Circuit has rejected the "technical accuracy" position and adopted a more stringent definition of the meaning of accurate information under section 607(b). Under that circuit's view, a credit reporting agency is unable to prevail on summary judgment if the plaintiff establishes that the agency reported factually correct information that could also be interpreted as being misleading or incomplete.[15] Thus, unless a credit reporting agency can show that it has generated a credit report containing information of "maximum possible accuracy," it will be unable to prevail on a motion for summary judgment. In Koropoulos, for example, the plaintiff defaulted on an installment loan, which the bank later charged off its books as a bad debt and referred to a credit agency. The plaintiff subsequently paid off the full amount of the debt to the collection agency, which retained 40% of this sum as a collection fee. After the debt was paid, the credit reporting agency reported the status of this account as being a bad debt with a zero balance.[16] In rejecting the technical accuracy approach on these facts, which are strikingly similar to those presented in Todd, the D.C. Circuit held that there was a factual question as to whether the credit reporting agency's treatment of this debt was so misleading as to be inaccurate within the meaning of section 607(b).[17]
 
 
 16
 The instant case, however, presents a much narrower issue that does not require us to ratify either of these two approaches as the law of the circuit. In both Todd and Koropoulos, the plaintiff-consumers contended that the credit reporting agencies failed to report or report clearly that they had at some later time fully satisfied their previously charged off accounts. Thus, in their view, the credit reports were "inaccurate" because they failed to report additional or explanatory information that would have corrected any misimpressions created by the credit reporting agencies' abbreviated remarks on their credit reports. In this case, on the other hand, Cahlin essentially contends that CBI should have ceased reporting any derogatory credit information about his GMAC account after the settlement in May, 1986. By carrying this account in some negative light until November, 1987, he alleges that CBI reported information that was inaccurate within the meaning of section 607(b).
 
 
 17
 Although a credit reporting agency has a duty to make a reasonable effort to report "accurate" information on a consumer's credit history, it has no duty to report only that information which is favorable or beneficial to the consumer. Congress enacted FCRA with the goals of ensuring that such agencies imposed procedures that were not only "fair and equitable to the consumer," but that also met the "needs of commerce" for accurate credit reporting.[18] Indeed, the very economic purpose for credit reporting companies would be significantly vitiated if they shaded every credit history in their files in the best possible light for the consumer. Thus, the standard of accuracy embodied in section 607(b) is an objective measure that should be interpreted in an evenhanded manner toward the interests of both consumers and potential creditors in fair and accurate credit reporting.
 
 
 18
 As noted above, a consumer may be able to recover for a violation of section 607(b) if he proves that a credit reporting agency published an inaccurate description of the consumer's relationship with a previous creditor. The issue presented here is whether a credit report containing derogatory information about an account which was charged off by a creditor for accounting purposes and which was later settled by the consumer for an amount less than the full balance due is "accurate". In determining whether a credit reporting agency's treatment of an account was "accurate," we are first guided by the intent of the creditor who transmitted the information about a particular account. Because GMAC was once a party to this dispute, there is significant, uncontroverted evidence in the record which sheds light on GMAC's attitude toward Cahlin's account. The district court found that the undisputed facts show that GMAC charged off Cahlin's account as a bad debt in November, 1985 and that when this debt was later settled for $2,000, GMAC intended the account to be reported as a "paid charge off" or the equivalent. The record also shows that GMAC's various instructions in October 1986 and 1987 to CBI to remove any derogatory information about Cahlin's account were largely motivated by a desire to mollify Cahlin and avoid potential litigation, not to correct any reporting errors by CBI. Thus, from GMAC's perspective, Cahlin's account would have been most accurately reported if it had been carried as a charged off account that was later paid off.
 
 
 19
 This conclusion is buttressed by a comparison between the relative accuracy of how CBI reported the GMAC account and how Cahlin alleges this account should have been reported. As we noted above, Cahlin does not challenge CBI's treatment of derogatory credit information as merely being ambiguous, incomplete, or misleading, but contends that "Cahlin never should have received an adverse credit report from GMAC to begin with." In interpreting the meaning of "accuracy" within section 607(b), we cannot conclude that a debt which has been charged off by the creditor and is later settled for an amount less than the original balance due should be reported without any derogatory references on a credit report. This information, which reflects the efforts required to collect a debt, is clearly of interest to potential creditors and would be effectively hidden by a credit report that treated the account as being in good standing.
 
 
 20
 Because Cahlin's position that CBI should have never reported any derogatory information about his GMAC account is not borne out by the record, we need not consider whether the changes in CBI's reporting of this account resulting from GMAC's letters of June 16, 1986 or October 9, 1986 were "inaccurate". The fact that CBI eventually acceded in November, 1987 to Cahlin's position on GMAC's instructions by completely rehabilitating his credit report does not make its earlier treatment of his account actionable under section 607(b). The deposition testimony of GMAC clearly establishes that Cahlin's account, even if reported today, might be reported as an "I9" with a zero balance. We would therefore subvert the policies animating FCRA were we to hold that a credit reporting agency can be held liable for not reporting information that is conceded to be inaccurate by the creditor. Such a result would neither improve the utility of credit reports nor make the current credit reporting system more equitable to consumers.[19]
 
 
 21
 Yet, even when the reporting of Cahlin's account is examined in detail, we find that CBI never reported any inaccurate information. Beginning in December, 1985 as a result of the termination of the lease agreement, CBI began reporting the GMAC account as a bad debt with an outstanding balance of $3,843.44. As we noted above, it is uncontroverted that this notation accurately reflected the status of the account at this time. After the terms of the settlement were satisfied, GMAC informed CBI in June, 1986 that the balance on the account had been liquidated, and, as a result, CBI changed the reporting of Cahlin's account to a bad debt with a zero balance. The deposition testimony of GMAC's representatives indicates without contradiction that this characterization of the account was accurate after May, 1986, and, indeed, is how this account might be reported today. Thus, any claim that CBI was reporting "inaccurate" information prior to June, 1986 is utterly without merit.
 
 
 22
 Due to Cahlin's complaints, however, GMAC further informed CBI by letter on October 9, 1986, the totality of which stated, to "[p]lease change the rating on the above customer's account from I-9 to I-1." In response, CBI changed the current status of Cahlin's GMAC account to an "I1" rating, which is a favorable rating, but moved the "I9" rating to the section of the report detailing past credit history. Relying on deposition testimony from a GMAC employee, Cahlin contends that it was against GMAC's intent to have any reference to an "I9" rating on his credit report after the October 9, 1986 letter and therefore all of CBI's reports from the date of this letter to November, 1987 were inaccurate.[20] We disagree. Viewed in the light most favorable to Cahlin, the facts show that GMAC in June, 1986 believed that the Cahlin account was accurately reported as being a bad debt with a zero balance, but agreed in October, 1986 to inform CBI to change the reporting of the account under the threat of litigation. This change of heart, however, does not erase the historical fact that until at least June, 1986, GMAC was reporting to CBI that the Cahlin account was a bad debt.[21] It was this information that was conveyed by CBI's report when it moved the "I9" rating to the previous history section of Cahlin's account. Thus, the notation was an "accurate" reflection of how GMAC had been reporting this account to CBI in the past. Nothing contained in GMAC's terse letter of October 9 instructs CBI to eradicate GMAC's own past characterizations of the account from future credit reports. As we noted above, the fact that CBI eventually abided by GMAC's instructions to wipe completely clean Cahlin's report in November, 1987 does not mean that its reporting of this account after October 9, 1986 was inaccurate. Those reports accurately reflected GMAC's current characterization of the account and how it had been previously reported and therefore are not actionable under FCRA.
 
 2. Duty to Reinvestigate
 
 23
 After a credit report has been prepared on a consumer, a credit reporting agency retains a duty under section 611(a) of FCRA to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer. When a consumer brings a claim for violation of this duty, a court is generally called upon to determine whether the credit reporting agency could have discovered an error in a particular report through a reasonable investigation.[22] Thus, a section 611(a) claim is properly raised when a particular credit report contains a factual deficiency or error that could have been remedied by uncovering additional facts that provide a more accurate representation about a particular entry.
 
 
 24
 In this case, however, no additional amount of factual investigation by CBI would have revealed any "inaccuracy" in its reporting of the GMAC account because there was none. Rather, as we noted above, Cahlin claims in essence that CBI erroneously mischaracterized and misinterpreted the charge off and later settlement of his debt to GMAC as being a negative credit event. That is, he argues that he should have been given a clean slate on his credit report after he settled the debt with GMAC's collection attorney. A consumer, however, cannot bring a section 611(a) claim against a credit reporting agency when it exercises its independent professional judgment, based on full information, as to how a particular account should be reported on a credit report. In this case, CBI initially reported that the GMAC account was a charged off account with an outstanding balance and eventually acceded to GMAC's directives that Cahlin's account be rehabilitated to avoid litigation. No reasonable investigation on the part of CBI could have uncovered any inaccuracy in Cahlin's report because there was never any factual deficiency in the report.[23] As we noted earlier, GMAC's representatives testified that CBI's reporting of Cahlin's account was accurate as of August, 1986 and that the same reporting would continue to be accurate today. We therefore find that the district court properly granted summary judgment to CBI on Cahlin's section 611(a) claim.
 
 B. TRW
 
 25
 We need not reach the substance of Cahlin's FCRA claims against TRW because we find that he has utterly failed to produce any evidence tending to show that he was damaged as a result of an allegedly inaccurate TRW credit report. Fed.R.Civ.P. 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[24] In this case, Cahlin bears the burden of proving that a TRW credit report was a causal factor in the denial of his residential mortgage loan by First Nationwide.[25] Despite the voluminous discovery already conducted in this case, the only evidence in the record, beyond Cahlin's bare allegations, that supports this element of his prima facia case is a letter prepared for First Nationwide requesting an explanation of the "paid charge off" notation attached to the GMAC tradeline on a TRW report.
 
 
 26
 Although this letter does provide circumstantial evidence indicating that a TRW report was used by First Nationwide to evaluate Cahlin's pending mortgage application, we find that it does not support the further inference that allegedly inaccurate information on that report was the cause of Cahlin's denial of credit. Such an inference, even if it were logically supportable, is completely overwhelmed by the affidavits proffered by TRW. The affidavit of Betty J. Del Place, the only employee that Cahlin claims he dealt with at First Nationwide, states that she cannot recall whether or not Cahlin's loan application was denied as a result of a TRW credit report. In addition, the affidavit of counsel for TRW states that the records of First Nationwide were produced pursuant to a subpoena and that no TRW report with derogatory information about the GMAC account was ever found. We stress that Cahlin had the affirmative duty of coming forward with evidence supporting his claim that TRW's alleged inaccurate report caused him harm. Despite more than adequate opportunity for discovery, he has failed to meet this burden, and the district court's grant of summary judgment in favor of TRW must be affirmed on this basis.
 
 
 27
 In affirming the district court's holding on Cahlin's claim against TRW, we do not imply that TRW would have been found liable to Cahlin. We simply do not address that issue.
 
 III.
 
 28
 For the foregoing reasons, the order of the district court is AFFIRMED.[26]
 
 COFFIN, Senior Circuit Judge, Dubitante:
 
 29
 I am unpersuaded that the record allows Cahlin's claims against CBI to be disposed of on summary judgment. Based on the salesman's alleged oral promise that Cahlin could return his leased car without liability within 90 days, plaintiff claims that his GMAC account always should have been viewed as timely paid. More importantly, plaintiff claims, and the deposition testimony of GMAC's special collections manager suggests, that after GMAC's effort in October 1986 to correct Cahlin's report, CBI should have reported his account as timely paid both currently and for previous history. See Deposition of Sue Deatrick, R. 62-83-89. Thus, in my view, a factual dispute exists regarding the objective accuracy of CBI's report, precluding summary judgment based on the threshold issue of accuracy. See Panel Opinion at 1156.*
 
 
 30
 In addition, I think there is a factual dispute as to whether CBI met its statutory obligations to "follow reasonable procedures to assure maximum possible accuracy," 15 U.S.C. Sec. 1681e(b), and to investigate consumer complaints within a reasonable period of time, id. at Sec. 1681i(a). In October 1986, GMAC directed CBI to change Cahlin's rating from an "I-9" to an "I-1"--the former indicating a delinquent account and the latter indicating an account timely paid within 30 days. In response to GMAC's letter, CBI made the change to I-1 for Cahlin's current status, but relocated the I-9 reference to his previous credit history. It seems to me that these two ratings are facially inconsistent. Either the account was paid timely or it was not. Nothing that I have found in the record explains how these two ratings reasonably could exist side-by-side. Thus, it appears that there is at least an issue of fact as to whether GMAC's letter should have caused CBI to investigate and clarify the status of Cahlin's account with GMAC (as did TRW).
 
 
 31
 It is entirely possible that my colleagues are correct that GMAC directed CBI to change its rating for Cahlin not because the company viewed the I-9 as wrong but only to avoid litigation. If so, it arguably would have been appropriate for CBI to insist that the record remain historically accurate by including a negative reference in past history. In my view, however, the record contains material factual disputes precluding such a conclusion at this stage of the case.
 
 
 
 *
 See Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit
 
 
 **
 Honorable Frank M. Coffin, Senior U.S. Circuit Judge for the First Circuit, sitting by designation
 
 
 [1]
 15 U.S.C. Secs. 1681a-1681t
 
 
 [2]
 15 U.S.C. Sec. 1681e(b)
 
 
 [3]
 Id. Sec. 1681i(a). If the consumer remains unsatisfied as to the outcome of the reinvestigation, he may file a brief statement setting forth his version of the dispute. The credit reporting agency is thereafter required to include that statement anytime the disputed information is published. Id. Sec. 1681i(b)-(c)
 
 
 [4]
 See id. Secs. 1681n & o
 
 
 [5]
 See Koropoulos v. Credit Bureau, Inc., 734 F.2d 37, 39 (D.C.Cir.1984); Todd v. Associated Credit Bureau Servs. Inc., 451 F.Supp. 447, 449 (E.D.Pa.1977), aff'd mem., 578 F.2d 1376 (3d Cir.1978), cert. denied, 439 U.S. 1068, 99 S.Ct. 834, 59 L.Ed.2d 33 (1979); see also Equifax Inc. v. FTC, 678 F.2d 1047, 1051 (11th Cir.1982) (citing cases)
 
 
 [6]
 See Stewart v. Credit Bureau, Inc., 734 F.2d 47, 51 (D.C.Cir.1984)
 
 
 [7]
 See Thompson v. San Antonio Retail Merchants Ass'n, 682 F.2d 509, 513 (5th Cir.1982); Hauser v. Equifax, Inc., 602 F.2d 811, 814-15 (8th Cir.1979)
 
 
 [8]
 See Bryant v. TRW, Inc., 689 F.2d 72, 78 (6th Cir.1982)
 
 
 [9]
 This term of art is actually a misnomer because the burden of proving that a particular report is inaccurate is part of the plaintiff's case and not an affirmative defense for a defendant credit reporting agency
 
 
 [10]
 See H.R.Conf.Rep. No. 1587, 91st Cong., 2d Sess. (1970), U.S.Code Cong. & Admin.News 1970, p. 4394
 
 
 [11]
 See, e.g., McPhee v. Chilton Corp., 468 F.Supp. 494 (D.Conn.1978)
 
 
 [12]
 451 F.Supp. 447 (E.D.Pa.1977), aff'd mem., 578 F.2d 1376 (3d Cir.1978), cert. denied, 439 U.S. 1068, 99 S.Ct. 834, 59 L.Ed.2d 33 (1979)
 
 
 [13]
 See id. at 448
 
 
 [14]
 See id. at 449; see also Wright v. TRW Credit Data, 588 F.Supp. 112, 114 (S.D.Fla.1984); Lowry v. Credit Bureau, Inc., 444 F.Supp. 541, 544 (N.D.Ga.1978); Middlebrooks v. Retail Credit Co., 416 F.Supp. 1013, 1015-16 (N.D.Ga.1976); Austin v. BankAmerica Service Corp., 419 F.Supp. 730, 732-33 (N.D.Ga.1974)
 
 
 [15]
 See Koropoulos, 734 F.2d at 40-42; see also Alexander v. Moore & Assocs., Inc., 553 F.Supp. 948, 952 (D.Haw.1982)
 
 
 [16]
 See Koropoulos, 734 F.2d at 38
 
 
 [17]
 See id. at 42
 
 
 [18]
 See 15 U.S.C. Sec. 1681
 
 
 [19]
 We stress again that we are not faced with the issue posed in Todd and Koropoulos as to whether CBI's exact treatment of the GMAC account was "accurate" within the meaning of section 607(b). See Koropoulos, 734 F.2d at 41. In this case, we simply affirm the district court's order on the ground that CBI's reporting of the GMAC account was more accurate than the negative-free report that Cahlin contends he should have received
 
 
 [20]
 We have examined the transcript of this deposition and find that there is a substantial question as to whether this statement is fairly supported by the record. However, because of the procedural posture of this case, we are required to view the facts in the light most favorable to Cahlin
 
 
 [21]
 Under the Act, a credit reporting agency is authorized to report information concerning "[a]ccounts placed for collection or charged to profit and loss" for up to seven years after such information is first collected. See Sec. 1681c(a)(4)
 
 
 [22]
 Compare Stewart, 734 F.2d at 55 & n. 13 (D.C.Cir.1984) (holding that credit reporting agency could not have reasonably discovered that a tax lien reported on a credit report was contested by the consumer) with Swoager v. Credit Bureau, 608 F.Supp. 972, 975-76 (M.D.Fla.1985) (holding that merely contacting creditor about a disputed entry does not amount to a reasonable investigation)
 
 
 [23]
 In such cases, we believe that Congress provided a unique remedy for consumers to dispute how a particular dispute is characterized or interpreted on their credit report by allowing them to enclose a statement as to their version of the dispute. See supra note 3. In this way, potential creditors have both sides of the story and can reach an independent determination of how to treat a specific, disputed account. See Swoager, 608 F.Supp. at 975
 
 
 [24]
 Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)
 
 
 [25]
 See Hauser, 602 F.2d at 816
 
 
 [26]
 Cahlin has also filed a motion to this court for attorney's fees under 15 U.S.C. Secs. 1681n(3) and 1681o (2). This motion is denied
 
 
 *
 I agree with my colleagues that it is undisputed that CBI initially was reporting accurately what GMAC told it. Thus, I would agree that CBI could not be held responsible for initially reporting Cahlin's account negatively. The lack of liability, however, does not render the original report accurate