# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

---

No. 97-4386

---

| | |
|---|---|
| Deborah Wilson, | * |
| | * |
| Appellant, | * |
| | *   Appeal from the United States |
| v. | *   District Court for the |
| | *   District of Minnesota. |
| Rental Research Services, Inc., | * |
| | * |
| Appellee. | * |

---

Submitted:  June 8, 1998

Filed: January 19, 1999

---

Before LOKEN, GODBOLD,[1] and HEANEY, Circuit Judges.

---

HEANEY, Circuit Judge.

Deborah Wilson appeals the district court's grant of summary judgment dismissing her claims against Rental Research Services, Inc. (Rental Research) brought under the Fair Credit Reporting Act (FCRA), 15 U.S.C. §§ 1681-1681u.  On

---

[1]The Honorable John C. Godbold, United States Circuit Judge for the Eleventh Circuit, sitting by designation.

appeal, we address (1) whether, as a matter of law, Rental Research followed reasonable

procedures to assure maximum possible accuracy with regard to Ms. Wilson in the report it issued on her; and (2) whether Rental Research had a duty prior to the 1996 amendments to the FCRA to reinvestigate consumer complaints about information furnished to Rental Research by another credit reporting agency. We reverse on the first issue and affirm on the second.

## I. Background

Rental Research is a credit reporting agency that provides information about prospective tenants to subscribing landlords. In Minnesota alone, landlords owning over 200,000 rental units subscribe to Rental Research, which offers to its subscribers a variety of services. In a typical transaction, the subscriber submits the name, current and former addresses, date of birth, and social security number of the prospective tenant to Rental Research and asks for an "Instant Inquiry" report. At the time in question, an "Instant Inquiry" report cost $15. For an additional $14, landlords could also receive a "Verified Completion Report" (VCR) which, according to Rental Research, reports only confirmed information. In preparing an "Instant Inquiry" report, Rental Research relies on information compiled from multiple databases, including housing court unlawful detainer records in Minnesota, western Wisconsin, and eastern North Dakota and credit reports from national credit reporting agencies such as TRW, Inc.

In February 1996, Deborah Wilson applied to Parkview Apartments, a Rental Research subscriber. Rental Research prepared an "Instant Inquiry" report on Wilson that included twelve "possible" reports of unlawful detainer actions with a defendant named Debra or Deborah Wilson.[2] These twelve reports were taken from the

---

[2] In an unlawful detainer action, the tenant is typically the defendant to the action filed by the landlord.

housing courts in Minneapolis and St. Paul over a period of less than three years. Two of the

unlawful detainers were filed on the same day in different counties, and another two were filed less than two weeks apart in different counties. The "Instant Inquiry" report gave the following warning before the section containing the list of "possible" unlawful detainers:

**WARNING**

THE FOLLOWING RECORDS FROM OUR DATA BASE ARE BASED SOLELY ON THE NAME. REVIEW WITH CAUTION FOR THE RECORDS REQUIRE VERIFICATION. THE INFORMATION MAY NOT PERTAIN TO THE SUBJECT OF THIS REPORT. IF A CONNECTION EXISTS, TELEPHONE VERIFIED INFORMATION TO OUR OFFICE MANAGER.

The "Instant Inquiry" report also included a "TRW Credit Report" that listed two terminated bankruptcy proceedings, one outstanding judgment, a closed credit line, and two other debts charged off as uncollectible.

After Wilson learned that Parkview Apartments denied her housing on the basis of the report, she obtained a copy from Rental Research. She then advised Rental Research that ten of the unlawful detainer reports were not hers and complained of two errors in the TRW section of the report. One week later, Rental Research presented Wilson with a revised report deleting all but two of the unlawful detainer reports. Rental Research, however, declined to reinvestigate the information provided by TRW, advising Wilson that she must contact TRW directly.

Wilson then commenced this suit as a class action challenging various Rental Research practices under the FCRA and the Minnesota Tenant Reporting Act, Minn. Stat. §§ 504.29-504.31. The district court dismissed one of her claims without prejudice by agreement of the parties and granted Rental Research summary judgment dismissing her other two claims. Wilson appeals the latter rulings, arguing that

5

Rental Research's manner of listing possible unlawful detainers in its "Instant Inquiry" reports

violates 15 U.S.C. § 1681e(b), and that Rental Research's refusal to reinvestigate the information furnished by TRW violates 15 U.S.C. § 1681i.

## II. Discussion

### A. The Unlawful Detainer Reporting Issue

We review a grant of summary judgment de novo and will affirm the judgment only if no genuine issue of material fact exists from which a reasonable juror could find in favor of the nonmoving party. See Fed. R. Civ. P. 56(c); Rothmeier v. Investment Advisers, Inc., 85 F.3d 1328, 1331 (8th Cir.1996).

Housing court records such as those accessed by Rental Research include a computerized summary of past unlawful detainer proceedings and may be publicly accessed and searched by the name of the defendant in the proceeding. Wilson challenges Rental Research's practice of providing landlords with an unverified listing of all "possible" unlawful detainer reports corresponding to the prospective tenant's name and permutations of it. Wilson argues that Rental Research's disclosure of "possible" unlawful detainers in its "Instant Inquiry" report violates its duty of accuracy under the FCRA:

> **(b) Accuracy of report.** Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

15 U.S.C. § 1681e(b). Section 1681e(b) of the FCRA deals with the credit reporting agency's duty in preparing the initial report, which is distinct from the agency's duty to reinvestigate once a consumer has identified allegedly inaccurate information. See 15 U.S.C. § 1681i. The FCRA imposes civil liability for willful or negligent noncompliance. See 15 U.S.C. §§ 1681n(a), 1681o.

7

In adopting the FCRA, the congressional purpose was to assure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information."  15 U.S.C. § 1681(b).  The Act was prompted by "congressional concern over abuses in the credit reporting industry." Philbin v. Trans Union Corp., 101 F.3d 957, 962 (3rd Cir. 1996) (quoting Guimond v. Trans Union Credit Info. Corp., 45 F.3d 1329, 1333 (9th Cir. 1995)).  As such, the goal of the Act is to protect individuals from inaccurate or arbitrary information about themselves in a consumer credit report.  See Pinner v. Schmidt, 805 F.2d 1258, 1261 (5th Cir. 1986).  We find that Rental Research's practices are not fair and equitable to the consumer, and its assertion that it fulfilled its obligations under the FCRA is contrary to both the purpose of the statute and the weight of authority interpreting it.

In order to state a claim under § 1681e(b), Wilson must first show that Rental Research produced a report containing inaccurate information. See Koropoulos v. Credit Bureau, Inc, 734 F.2d 37, 39 (D.C. Cir. 1984) (Wald, J.).  We disagree with the district court's conclusion that the report produced by Rental Research on Wilson was accurate as a matter of law simply because it is both "technically accurate" and contained a warning disclosing the accuracy limitations of the reporting method employed.  Thus, the district court erred in granting summary judgment to Rental Research.  See Cahlin v. General Motors Acceptance Corp., 936 F.2d 1151, 1156 (11th Cir. 1991) ("[P]rior to sending a [§ 1681e(b)] claim to the jury, a credit reporting agency can usually prevail only if a court finds, as a matter of law, that the credit report was 'accurate.'").

The flaw in the district court's analysis is that the FCRA requires more than simply that the report be "accurate" without reference to a specific context.  Rather,

in determining the meaning of "maximum possible accuracy" under § 1681e(b), the statutory language requires that reports be "accurate" specifically with respect to the

individual who is the subject of the report.[3]  In <u>Koropoulos</u>, the D.C. Circuit examined the meaning of "accuracy" under § 1681e(b) and reversed the district court's grant of summary judgment in favor of the defendant based on the factual accuracy of the report at issue.  <u>See</u> 734 F.2d at 47.  The court found that reports containing factually correct information that nonetheless mislead their readers are neither maximally accurate nor fair to the consumer who is the subject of the report and thus may violate § 1681. <u>See</u> <u>id.</u> at 40-42; <u>see also</u> <u>Alexander v. Moore & Assoc., Inc.</u>, 553 F. Supp 948, 952 (D. Haw. 1982) ("[S]ection 1681e(b) of the Act, fairly read, would apply to consumer reports even though they may be technically accurate, if it is shown that such reports are not accurate to the maximum possible extent."). The Fifth Circuit reached a similar conclusion in <u>Pinner</u>, holding that § 1681e(b) liability attaches to information that is strictly correct, but nonetheless misleading. <u>See</u> 805 F.2d at 1262-63.  Here, the report produced by Rental Research, although an accurate reflection of the housing court records, was not maximally accurate in any sense with regard to Wilson, the individual who was the subject of the report, as required by §1681e(b).  The report was also misleading with respect to Wilson in that a landlord could not determine which, if any, of the unlawful detainers were brought against her.

Rental Research and the district court place undue weight on the fact that the report simply reflected information contained in the public housing court records.  In <u>Cotto v. Jenney</u>, a case factually similar to this one, the court noted:

_____

[3]We read the district court as essentially endorsing the discredited "technical accuracy" defense to § 1681e(b) actions.  While initially accepted by a few district courts,  <u>see, e.g.,</u> <u>Todd v. Associated Credit Bureau Servs., Inc.</u>, 451 F. Supp 447, 449 (E.D. Pa. 1977), the defense was then "universally criticized by commentators for taking an unjustifiably narrow view of 'maximum accuracy.'"  <u>Koropoulos</u>, 734 F.2d at 41 n.7. We join the strong majority of courts since the <u>Koropoulos</u> decision in rejecting the "technical accuracy" defense in favor of a thorough examination of whether the report was maximally accurate with respect to the individual who is the subject of the report.

> Information may be unreasonably reported and misleading even if it is
> public information. Indeed, in this case, a jury may well determine that
> defendants' report . . . that an Iris Cotto on Chestnut Street was behind
> in her rent--even though technically true and information in the public
> domain--was negligent because it was the *wrong* Iris Cotto. The
> manner in which the public information was reported may violate the
> FCRA.

721 F. Supp 5, 7 (D. Mass. 1989) (emphasis in original); <u>see also</u> <u>Andrews v. Trans Union Corp.</u>, 7 F. Supp.2d 1056, 1074 (C.D. Cal. 1998) (report may have been misleading when reporting agency disclosed two files: the plaintiff's actual file, a perfect match to the information supplied by subscriber, and another file with a delinquent account that was only a partial match to the information supplied). We find the above reasoning to be consistent with the language of the FCRA and its purpose, as articulated by Congress, of protecting individual consumers from the harm caused by unfair credit reporting. <u>See</u> 15 U.S.C. § 1681(b).

The dissent asserts that our decision creates a conflict with <u>Henson v. CSC Credit Servs.</u>, a Seventh Circuit opinion that held a credit reporting agency was not liable under the FCRA for its inaccurate report reproducing an erroneous entry in a court's judgment docket. <u>See</u> 29 F.3d 280, 285 (7th Cir. 1994). <u>Henson</u> involved a clerk's error resulting in court records mistakenly reflecting a money judgment that in fact had never been entered. The error was compounded when the defendant credit reporting agency published a report in reliance upon the false information. Though the plaintiff in <u>Henson</u> was similarly the victim of an erroneous report, the factual predicate for suit is easily distinguishable from that in the instant case. The <u>Henson</u> court was faced with a singular clerical error, not the core practice at issue in this case, which is Rental Research's practice of including all records corresponding to permutations of a certain name without verifying that they pertain to the individual who is the subject of the report. Furthermore, the <u>Henson</u> court was influenced by the fact that reliance on official court records about an individual is unlikely to lead to

11

inaccurate credit reporting except in isolated cases such as where the clerk of court incorrectly records

a judgment.  See id.  The same cannot be said of Rental Research's practices, which will lead to inaccuracies any time there is another person in the housing court database with a name similar to that of the subject of the report.[4] The Henson case thus has no bearing on the outcome of this case, and we have not created a conflict between the circuits.

Rental Research contends that the warning included with the "Instant Inquiry" report satisfies the FCRA's accuracy requirement because the report then accurately reflects "possible" unlawful detainers, attributable to various permutations of the name Deborah Wilson.  This argument conflicts, however, with the plain language of the statute, which requires maximum possible accuracy *with regard to the individual*.  It would fly in the face of congressional intent if consumer reporting agencies could escape their statutory obligation of accuracy with regard to an individual by simply issuing a warning that the report may not, in fact, be accurate with regard to that individual.  Furthermore, a jury may also properly find that the report was misleading as to Wilson even with the warning.  See Andrews, 7 F. Supp.2d at 1074 (plaintiff presented genuine issue of material fact that precluded summary judgment as to whether the presentation by the reporting agency, taken as a whole, was misleading despite the fact the file supplied by the agency contained a warning that the file was only a partial match to the inquiry).  Because the report in this case contained ten reports of unlawful detainers that were not Wilson's, she has raised a genuine issue of material fact as to whether the report was inaccurate on its face, or alternately, sufficiently misleading as to render it inaccurate within the meaning of the FCRA.

---

[4]The Henson court was also influenced by the notion that an individual is capable of detecting errors in their own court documents and then giving notice to the credit reporting agencies that rely on such information.  See 29 F.3d at 285-86.  Of course, an individual such as Wilson has no way of detecting errors in the court documents of other persons with similar names or anticipating that even accurate information from other individual's court documents will appear in her credit reports.

13

A jury determination that an agency issued an inaccurate report does not, however, end the inquiry under § 1681e(b). Even if the report was inaccurate, Wilson must also establish that the inaccuracy resulted from a failure to use reasonable procedures on the part of the credit reporting agency. See Cahlin, 936 F.2d at 1156 (agency can escape liability if it establishes that an inaccurate report was generated by following reasonable procedures). Whether the agency followed reasonable procedures "will be a jury question in the overwhelming majority of cases." Id.; Guimond, 45 F.3d at 1333. In evaluating the reasonableness of an agency's procedures, we endorse the balancing approach adopted by the D.C. Circuit in Koropoulos. The Koropoulos court stated that:

> Under this approach, the court . . . would weigh the potential that the information will create a misleading impression against the availability of more accurate [or complete] information and the burden of providing such information. Clearly the more misleading the information [*i.e.*, the greater the harm it can cause the consumer] and the more easily available the clarifying information, the greater the burden upon the consumer reporting agency to provide this clarification.

734 F.2d at 42 (quoting Moore, 553 F. Supp at 952) (alterations in original).

The importance of housing and the nature of the rental housing market intensify the damage done to consumers who are the victims of an inaccurate report. Because landlords need to fill units promptly, by the time a tenant screening report is corrected, the unit is often rented. Landlords have little incentive to verify "possible" negative information, since they have the option of simply choosing another prospective tenant who has no negative information. This is particularly true in metropolitan areas such as the Twin Cities where vacancy rates are approximately one to two percent. See, *Renters Report*, Minneapolis Star-Trib., Dec. 9, 1998, at H1 (Source: Apartment Search Profiles).

14

Although Wilson was able to obtain a corrected report in about one week from Rental Research, she has nonetheless presented substantial evidence of the harm caused to the consumer by Rental Research's practice. Wilson and others like her, particularly those with common names, face a potentially costly delay in obtaining housing when they are unfairly taken out of consideration for an apartment due to inaccurate information in a credit report. Not only must they find housing for themselves and their families during the delay, they may also lose multiple application fees when landlords deny their applications based on the incorrect report generated by Rental Research.

We also note that the circumstances and nature of the report's inaccuracy may sustain an inference that an agency acted negligently. See Stewart v. Credit Bureau, Inc., 734 F.2d 47, 53 n.8 (D.C. Cir. 1984) (per curium). "A possible example [of such circumstances] is where the report or other information suggests the agency 'had reason to know something was amiss.'" Jones v. Credit Bureau of Garden City, Inc., 703 F. Supp. 897, 901 (D. Kan. 1988) (quoting Swoager v. Credit Bureau of Greater St. Petersburg, 608 F. Supp. 972, 975 (M.D. Fla. 1985)). In the instant case, the information contained in Wilson's report was, on its face, enough to alert Rental Research that something was amiss. The report listed a total of twelve unlawful detainers in a period of less than three years, two of which were filed on the same day in different counties, and another two of which were filed less than two weeks apart in different counties. These strong indicators that the report was inaccurate with regard to Wilson create a genuine issue of material fact as to whether Rental Research followed reasonable procedures in releasing the report without further verification. This issue may only be properly resolved by the jury.

We next address Rental Research's contention that given the limited information in the housing court database, verification would likely be impossible or prohibitively expensive. The record shows that Rental Research was in fact able to

verify information when asked to do so by Wilson and was able to provide her with a correct

report in one week.  The "Verified Completion Report" service offered by Rental Research establishes that further verification of the records is possible, even if it is not one-hundred percent accurate.  In any event, alleged difficulty in verification is not dispositive, but simply one factor for the jury properly to consider in determining whether Rental Research used reasonable procedures.  Additionally, the warning placed in the report by Rental Research is likewise a factor for the jury to consider in assessing reasonableness of procedures.  See Cotto, 721 F. Supp. at 7 (warning by the reporting agency that the report issued may refer not to the prospective tenant but to another woman by the same name does not foreclose a jury trial but rather creates a factual dispute as to the reasonableness of the agency's reporting procedures, which can only be resolved by the jury).

Finally, contrary to the dissent's assertion, our holding that Rental Research must do more than report what is contained in the housing records does not conflate its § 1681e(b) duty in preparing the initial report with its duty under § 1681(I)a to *re*investigate allegedly inaccurate information once it is informed of the inaccuracy by the consumer.  Under the clear statutory language of § 1681e(b), Rental Research must use reasonable procedures to ensure that the report is maximally accurate with regard to the individual subject *in preparing the initial report*.  Given a particular set of facts, the cost-benefit analysis may indeed shift to the consumer in favor of a reinvestigation even though it favored the agency in the initial report.  In the instant case, however, Wilson has created a jury issue as to whether Rental Research violated its statutory duty in preparing the initial report.

## B.  The TRW Issue

We now turn to whether Rental Research violated 15 U.S.C. § 1681i.  Rental Research responded to Wilson's complaint of inaccuracies in the portion of the "Instant Inquiry" supplied by TRW by declining to reinvestigate and referring her directly to

TRW.[5]  Wilson argues that Rental Research's failure to contact TRW regarding the disputed information violated the pre-1996 amendment version of § 1681i(a) of the FCRA:

> **Procedure in case of disputed accuracy.**  (a) If the completeness or accuracy of any item of information contained in his file is disputed by a consumer, and such dispute is directly conveyed to the consumer reporting agency by the consumer, the consumer reporting agency shall within a reasonable period of time reinvestigate and record the current status of that information unless it has reasonable grounds to believe that the dispute by the consumer is frivolous or irrelevant.  If after such reinvestigation such information is found to be inaccurate or can no longer be verified, the consumer reporting agency shall promptly delete such information.  The presence of contradictory information in the consumer's file does not in and of itself constitute reasonable grounds for believing the dispute is frivolous or irrelevant.

15 U.S.C. § 1681i(a).  We disagree.

Under § 1681i, TRW must only respond to complaints directly conveyed by the consumer to the consumer reporting agency.  Therefore, TRW would presumably have ignored any third party complaint from Rental Research.  We agree with the district court that under the statute at the time of the dispute, Rental Research was not the consumer reporting agency obligated to reinvestigate TRW's information.

The 1996 amendments to the FCRA specifically addressed this problem by modifying § 1681i(a) to require that a consumer reporting agency asked to reinvestigate by an individual about whom they have issued a report, such as Rental Research was asked by Wilson in this case, "shall provide notification of the dispute to any person

---

[5]Rental Research advised Wilson: "The information contained in TRW's credit report that you dispute must be addressed to TRW.  You may contact TRW by mail: PO Box 949, Allen, Texas, 75013.  Or by telephone: 1-800-422-4879."

who provided any item of information in dispute." 15 U.S.C. § 1681i(a)(2)(A). An added section provides that upon notice of a dispute from a consumer, a furnisher of information must (a) conduct an investigation with respect to the disputed information, (b) review all relevant information provided by the consumer reporting agency, (c) report the results of the investigation to the consumer reporting agency, and (d) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis. See § 1681s-2(b)(1).

Under the 1996 amendments, Rental Research would have a duty to notify TRW of Wilson's complaint challenging the accuracy of the information furnished by TRW. However, as Wilson's complaint only encompasses events occurring before September 30, 1997, the effective date of the 1996 amendments, the district court was correct in dismissing her claim for § 1681i(a) relief.

### III.  Conclusion

For the reasons stated above, we reverse the district court's grant of summary judgment in favor of Rental Research on Wilson's § 1681e(b) claim and remand for further proceedings consistent with this opinion. We affirm the district court's grant of summary judgment to Rental Research on Wilson's § 1681i(a) claim.

LOKEN, Circuit Judge, dissenting in part.

I respectfully dissent from the court's decision to reverse the grant of summary judgment dismissing Deborah Wilson's claim under § 607 of the Fair Credit Reporting Act, 15 U.S.C. § 1681e(b). In my view, Rental Research's reporting of public information from local housing courts was accurate as a matter of law.

Housing courts in Minneapolis and St. Paul maintain computerized summaries of past unlawful detainer proceedings. Twin Cities landlords can search this data by the names of the unlawful detainer parties to learn whether a prospective tenant has been sued for eviction by a prior landlord. Because these court records list the tenant's name as spelled by the landlord plaintiff, with no additional identifying information such as date of birth or social security number, a landlord searching for prior eviction actions against a prospective tenant with a name such as "Deborah" would note actions involving persons with substantially similar names such as "Debra" or "Debrah."[6] And when the prospective tenant has a common surname such as Wilson, a landlord personally searching these records would know that any reported unlawful detainer action might have involved a different person.

For $15.00, Twin Cities landlords may obtain this housing court information (and a great deal more information) by purchasing an Instant Inquiry report from Rental Research. In the section listing unlawful detainer information, the Instant Inquiry reminds landlord subscribers of the limitation inherent in this data by stating:

* * WARNING * *

THE FOLLOWING RECORDS FROM OUR DATA BASE ARE BASED SOLELY ON THE NAME. REVIEW WITH CAUTION FOR THE RECORDS REQUIRE VERIFICATION. THE INFORMATION MAY NOT PERTAIN TO THE SUBJECT OF THIS REPORT. IF A CONNECTION EXISTS, TELEPHONE VERIFIED INFORMATION TO OUR OFFICE MANAGER.

The court nonetheless concludes that any consumer whose Instant Inquiry reported an unlawful detainer involving a different person may have a claim for damages under

---

[6]For example, the two unlawful detainers confirmed after Wilson complained to Rental Research appeared in the housing court records under different first names, one as "Deborah Wilson," and the other as "Debra Wilson."

§ 1681e(b) submitted to a jury on the question whether Rental Research followed reasonable procedures to assure the maximum possible accuracy of its information. Under this ruling, Rental Research will be subject to a jury trial every time a $15.00 Instant Inquiry reports as "possible" an unlawful detainer action involving a person other than the subject of the report.

Of course, the effect of the court's ruling will be to eliminate as cost prohibitive this category of information from the Instant Inquiry reports. This means that landlords either must obtain the housing court information themselves at greater expense, or do without information that helps them identify the small but costly group of tenants who make a practice of not paying rent until they are forcibly evicted. Either way, the cost of providing rental housing will increase, a cost that is inevitably passed on to the vast majority of renters who pay their bills.[7] Though I recognize that the "wrong person" problem is potentially difficult for prospective tenants with common surnames, I find nothing in the language or history of § 1681e(b) supporting the court's decision to use that statute to invalidate Rental Research's legitimate service.

As the court concedes, to recover under § 1681e(b) Wilson must prove the Instant Inquiry report was inaccurate.[8] Wilson admits her Instant Inquiry was

---

[7]According to U.S. Census Bureau data from February 1997, 9% of the nation's landlords reported that over 25% of their tenants were rent delinquent in the prior two years, and almost 19% of those landlords had been to court as plaintiffs five times or more during that period. Obviously, therefore, formal evictions are a significant part of the total cost of operating rental property. Stated differently, weeding out prospective tenants who will require formal eviction lowers rental costs for all others.

[8]In Henson v. CSC Credit Services, 29 F.3d 280, 285 (7th Cir. 1994), the Seventh Circuit *held* "that, as a matter of law, a credit reporting agency is not liable under the FCRA for reporting inaccurate information obtained from a court's Judgment Docket, absent prior notice from the consumer that the information may be inaccurate." By subjecting Rental Research to possible liability for reporting

-21-

technically accurate, that is, Rental Research correctly copied or reproduced the housing court records. There is also the issue of what I would call judgmental accuracy -- whether Rental Research accurately chose which housing court information to include in a particular Instant Inquiry. Wilson argues Rental Research failed at this level because it reported as "possibles" other people's unlawful detainers. However, even if it is proper to look beyond technical accuracy when dealing with public court records, the Instant Inquiry report was accurate because Rental Research reasonably selected the unlawful detainer actions to include as "possibles" and then clearly warned landlord subscribers of the accuracy limitations inherent in the housing court data. Given this disclosure, the court engages in fantasy when it speculates that the Instant Inquiry was *misleading* because "a landlord could not determine which, if any, of the unlawful detainers were brought against [Wilson]." Ante at p.6. No one, and most assuredly not an experienced landlord, could be misled by housing court information that is accurately reproduced and described. Because the information combined with the Warning was neither inaccurate nor misleading, the district court properly granted summary judgment dismissing Wilson's § 1681e(b) claim.

There are two additional reasons why this interpretation of § 1681e(b) is consistent with the statute's purpose, as well as its plain meaning. First, neither Wilson nor the court explains how Rental Research could verify unlawful detainer "possibles" when preparing Instant Inquiry reports. Given the limited information in the housing court database, the most likely sources of confirming information would be the landlords involved in the unlawful detainer actions, or the prospective tenant herself. Verification by personal contacts of this kind is costly and time consuming. It can most effectively be done by Rental Research's subscribing landlord, after the landlord decides that the unlawful detainer information is sufficiently material to its rental

---

information contained in housing court records even though Wilson gave no prior notice of inaccuracies, the court seems to have created a conflict in the circuits.

-22-

decision to warrant further inquiry.[9]   Instead, the court unrealistically places on Rental Research the costly duty to verify all such information.  The FCRA should not be construed so as to substantially increase the cost of accessing "presumptively reliable" data such as housing court records.  Henson, 29 F.3d at 285.

Second, compelling Rental Research to look beyond the four corners of the public housing court records to verify the identity of unlawful detainer "possibles" improperly conflates a reporting agency's duty under § 1681e(b) in preparing the initial consumer report, with its duty under § 1681i to reinvestigate once the subject of the report has identified allegedly inaccurate information.  "Once a claimed inaccuracy is pinpointed, a consumer reporting agency conducting further investigation incurs only the cost of reinvestigating that one piece of disputed information.  In short, when one goes from the § 1681e(b) investigation to the § 1681i(a) *re* investigation, the likelihood that the cost-benefit analysis will shift in favor of the consumer increases markedly." Cushman v. Trans Union Corp., 115 F.3d 220, 225 (3d Cir. 1997), following Henson, 29 F.3d at 286-87.

I agree with the court that Rental Research did not violate former 15 U.S.C. § 1681i by declining to notify TRW of Wilson's complaint that TRW had reported inaccurate information.  Accordingly, I would affirm.

---

[9]Here, for example, the Instant Inquiry on Wilson reported two terminated bankruptcy proceedings, four judgments, and nine credit situations in Chicago and the Twin Cities, in addition to the twelve unlawful detainer reports from Twin Cities housing courts.  No landlord would need to verify that some of the unlawful detainers in fact involved Wilson before concluding she was a serious credit risk.

A true copy.

Attest.

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.