**Revised November 10, 1998**

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

**No. 97-50423**

---

**EDWARD C. SEPULVADO; SHEREE D. SEPULVADO,**

  **Plaintiffs - Appellees-Cross-Appellants,**

**VERSUS**

**CSC CREDIT SERVICES, INC.; ET AL.,**

  **Defendants,**

**CSC CREDIT SERVICES, INC.,**

  **Defendant - Appellant-Cross-Appellee.**

---

Appeals from the United States District Court
for the Western District of Texas

---

October 23, 1998

Before KING, EMILIO M. GARZA, and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

CSC Credit Services, Inc. (CSC) appeals from judgment entered in favor of plaintiffs Sheree and Edward Sepulvado, after a bench trial, in this matter brought pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 - 1681(t).  We reverse, and render judgment in favor of the defendant, CSC.

BACKGROUND

The Sepulvados' claim that an erroneous credit item on a report prepared by CSC caused Texas Homestead Mortgage Company (Texas Homestead) to deny them a mortgage for the purchase of a new home. The material facts relating to the parties' conduct are essentially undisputed.

I.    The Prior Foreclosure and the New Purchase

In 1984, Edward and Sheree Sepulvado purchased a home. In the summer of 1988, the Sepulvados were unable to make timely payments. In July 1988, the mortgage lender, the now-defunct University Savings, foreclosed on the home. University Savings sold the home for less than was owed by the Sepulvados, which created a deficiency on their account of $12,333. Sometime around June 1989, University Savings reported the foreclosure to certain credit reporting agencies, including the defendant CSC. University Savings did not report any deficiency at that time.[1] In July 1989, University Savings notified the Sepulvados that they were responsible for the $12,333 deficiency and attempted collection by a form letter dated July 21, 1989. The Sepulvados never paid the deficiency, and University Savings did not reduce the obligation to

---

[1]    The record contains the form filed by University Savings to report the foreclosure to CSC. That form does not mention any deficiency. The record also contains credit reports from two other credit reporting agencies that were issued in June 1989. Although those reports reflect the foreclosure, neither report indicates that there was any deficiency associated with the foreclosure.

judgment by commencing legal action.

Under the provisions of the Fair Credit Reporting Act, the Sepulvados foreclosure and the resulting deficiency could have been reported on their credit for a period of seven years. *See* 15 U.S.C. § 1681c(a). The Sepulvados knew this, and for more than six years lived in rental property while waiting for the foreclosure to drop off of their credit report. Then in March 1995, approximately six years and eight months after the foreclosure, the Sepulvados signed an earnest money contract to purchase a new home. The Sepulvados were referred by the builder to Texas Homestead to finance that purchase.

II.  The Mortgage Application

The Sepulvados informed the Texas Homestead loan officer, Wendy Jamison, about the earlier University Savings foreclosure. The Sepulvados did not inform Ms. Jamison about the deficiency resulting from the foreclosure. Ms. Jamison told the Sepulvados not to include any information about the foreclosure on their application.[2]  That advice was apparently based upon the

---

[2]  This fact was disputed at trial. Ms. Jamison conceded that the Sepulvados told her about the foreclosure during the application process, but denied that she told them to omit the information from their application. Her testimony at trial was contrary to Mrs. Sepulvado's testimony. The district court resolved the factual dispute in favor of the Sepulvados. On the basis of the entire record, that finding is not clearly erroneous. *See* **Stevenson v. TRW Inc.**, 987 F.2d 288, 292 (5th Cir. 1993).

possibility that the foreclosure had already been removed from their credit report, or would be removed before the purchase of the new home was closed. Ms. Jamison also told the Sepulvados that Texas Homestead might approve the mortgage even if the aging foreclosure appeared on the credit report, provided that their credit report was otherwise as they had represented it in the application. Once again, there was no conversation concerning either the existence of the deficiency or the effect that a deficiency would have on their application. The Sepulvados did not include any information about the foreclosure in the Texas Homestead application, although that information was clearly called for by the language of the application.

III. The Negative Credit Report

On or about March 13, 1995, Texas Homestead obtained a credit report on the Sepulvados from Advanced Credit Technology (ACT). The report contained an entry that was ultimately determined to be related to the deficiency created by the 1988 University Savings foreclosure. On its face, however, the ACT entry indicated that Mr. Sepulvado owed $12,333 on an account with an "open date" of March 1994, and that no payments had ever been made.

ACT retrieved the information made the basis of that entry from a database maintained and provided by Equifax. Equifax is an

4

affiliate of the defendant, CSC.[3]  ACT made certain material changes to the CSC entry before sending its own report to Texas Homestead.  For example, whereas the ACT entry reported an "open date" of March 1994, the CSC entry reported that an obligation in the amount of $12,333 had been "assigned" to "CSC/TCCP" in March 1994.[4].[5]  At trial, ACT President James Fuchs confirmed that the

[3]    CSC stipulated at trial that ACT had access to the Equifax database.  The record is otherwise silent with regard to the precise relationship between Equifax and CSC.  Neither ACT, who provided the report relied upon by Texas Homestead, nor Equifax, who provided the database accessed by ACT, were sued in this litigation.

[4]    Neither the ACT report submitted to Texas Homestead nor the CSC report from which ACT derived its own entry are in the record.  The district court's order drew its description of the ACT entry from Plaintiff's trial exhibit 1.  Plaintiff's exhibit 1 contains two documents, one of which is an updated and amended ACT report that was issued about one month after the original report to Texas Homestead, and one of which is a notice in letter form that ACT sent directly to the Sepulvados.  The two documents contain slightly different versions of the entry, and neither of those versions correspond exactly with the rendition given in the district court's order. Nonetheless, the district court found, and the parties do not dispute that the ACT entry contained the following information:

> Account Designation A; Creditor TCCP; Account Number 1150; Open Date 03/94; Report Date 03/95; High Credit $12333; Last Activity 03/94; Balance $12333; Months past due $12333; Late Payments COLLECT; Comment: For Telacu Carpenter Coll Partners, Date of last activity 03/94; Collection For; TCCP Texas; Unpaid, 07/94; 713-918-5756 Sharon Rice.

The district court's order drew its description of the CSC entry from Plaintiff's exhibit 2.  That document is a credit report issued by CSC in July 1995, several months after ACT retrieved the CSC entry from the Equifax database.  Nonetheless, the district court found, and the parties do not dispute, that the CSC entry contained the following information:

information ACT retrieved from credit repositories was often reformatted before the issuance of an ACT report.

When Texas Homestead received the ACT report, Ms. Jamison read the described entry to reflect that the Sepulvados had taken out a $12,333 loan in March 1994, and then immediately defaulted without making any payments. Ms. Jamison informed Mrs. Sepulvado that the mortgage would not be approved as long as the outstanding account remained on the credit report. Testimony from both Ms. Jamison and a mortgage banker produced by the defense established that mortgage lenders will not approve a mortgage when there is a collection item reported on the credit report. In making that decision, industry practice requires that the mortgage lender be guided primarily by information on the face of the credit report, rather than by any explanatory statements that might be provided by the applicant. Accordingly, Ms. Jamison further informed Mrs. Sepulvado that neither Texas Homestead nor Ms. Jamison herself could assist the

---

COLLECTION REPORTED 07/94; ASSIGNED 03/94 TO CSC/TCCP (713) 918-5799 CLIENT-TCCP TEXAS; AMOUNT-$12,333; UNPAID 07/94; BALANCE-$12,333 07/94 DATE OF LAST ACTIVITY 03/94; INDIVIDUAL; ACCOUNT NUMBER 1150.


Although there is no sound basis in the record for verifying the precise format or content of either entry, there is no active dispute about the material content of either entry, and therefore, no basis for finding the district court's rendition of those entries clearly erroneous. *Stevenson*, 987 F.2d at 292 ("Our standard of review is deferential to the district court. We uphold findings of fact unless we are left with the firm and definite conviction that they were 'clearly erroneous.'").

Sepulvados with regard to removing the negative entry. Rather, Ms. Jamison encouraged the Sepulvados to contact the creditor and the credit reporting agency to determine whether the entry was being erroneously reported.

Near the same time, ACT also sent the Sepulvados a letter informing them that adverse credit history had been reported to Texas Homestead. The letter contained a version of the ACT entry which showed an outstanding collection item in the amount of $12,333. Although the letter reported that Texas Homestead had requested additional information about the item, the undisputed testimony at trial, from both the President of ACT and Ms. Jamison, was that Texas Homestead never instigated any request for information from ACT.

IV. The Sepulvados' Attempts to Clear their Credit Report

The Sepulvados began their investigation by calling the number listed for "CSC/TCCP" in the credit report. As suggested by the entry, TCCP is also affiliated with CSC. TCCP was formed in January 1994 as a partnership between CSC and the Resolution Trust Corporation (RTC) for the purpose of collecting mortgage foreclosure debts. The CSC entry at issue in this case was submitted by the RTC when the debt was assigned by the RTC to "CSC/TCCP" in March 1994.[6] Thus, defendant CSC was in the peculiar

_____

[6] There is no evidence that the deficiency was ever reported against the Sepulvados' credit prior to that time.

7

position of acting as both the creditor and the credit reporting agency with respect to the objectionable entry.

That duplicity was compounded by the fact that CSC apparently maintained little, if any, functional separation between the credit reporting division and the collection division. When Mrs. Sepulvado called the number provided in the entry for CSC/TCCP on March 14, she was transferred to CSC employee Mark Lewis. Mr. Lewis represented to the Sepulvados that he was in a position to change their credit reports. Mr. Lewis was also attempting to collect the debt.[7] After some investigation, Mr. Lewis told Mrs. Sepulvado that the entry related to the $12,333 deficiency resulting from the 1988 University Savings foreclosure. Mr. Lewis did not explain to Mrs. Sepulvado why CSC was entitled to collect on that debt.

The following day, March 15, 1995, Mrs. Sepulvado called Mr. Lewis and offered to settle the account for ten percent of the deficiency owed. Mr. Lewis rejected the offer, but countered that CSC would accept fifty percent of the deficiency. Mrs. Sepulvado rejected the counteroffer and the conversation was ended.

On March 16, 1995, Mr. Sepulvado contacted Mr. Lewis and explained that the entry on the credit report was inaccurate because it did not reflect that the obligation arose from a 1988

---

[7]     Mr. Lewis was an employee of CSC's collection division. Whatever internal separation may have existed between CSC's collection division and its reporting division, CSC has not argued that it is not bound by the actions of its agent, Mark Lewis.

8

mortgage foreclosure. Mr. Lewis responded that CSC could report the item "in any manner [CSC] saw fit," that the entry could "be reactivated any time," and that CSC could report the item for the rest of the Sepulvados' lives if it saw fit. Mr. Lewis also informed Mr. Sepulvado that the entry would continue to impede their attempts to get a new mortgage. In spite of Mr. Sepulvado's request that the entry be amended to reflect that the obligation related to a 1988 mortgage foreclosure and resulting deficiency, Mr. Lewis did not supplement the entry to reflect those facts, did not inform Mr. Sepulvado that he had a right to supplement the report with his own statement about the debt, and did not make any notation in the credit report that the obligation was disputed.

On April 10, shortly before the final mortgage decision by Texas Homestead, Mrs. Sepulvado called CSC directly for the last time to complain again that the CSC entry was inaccurate because it led the mortgage company to believe that the $12,333 entry related to a 1994 personal loan rather than a 1988 mortgage foreclosure. Once again, CSC refused to correct or supplement the entry to indicate that the obligation actually arose from the 1988 foreclosure.

9

V.    Rejection of the Mortgage Application and
      Subsequent Efforts to Obtain Documentation

The Sepulvados informed Texas Homestead, through Ms. Jamison, that the negative item related to the 1988 University Savings foreclosure.  That information from the Sepulvados was of minimal effect.  Following industry practice, Texas Homestead made its decision on the basis of the credit report, rather than anecdotal or explanatory information from the Sepulvados.  The Sepulvados' application was formally denied on or about April 11, 1995.  Texas Homestead issued a letter stating that the decision was made on the basis of negative credit entries, but Ms. Jamison told the Sepulvados that the rejection of their application was primarily due to the $12,333 collection item.

After the mortgage was declined, the Sepulvados continued in their efforts to obtain information about the objectionable entry, this time with the aid of their attorney.  On April 12, the Sepulvados' attorney called Mr. Lewis and requested documentation confirming the Sepulvados' debt.  On April 26, having received no response, the attorney renewed that request.  Mr. Lewis responded by fax the same day, sending (1) a copy of the form letter sent to the Sepulvados by University Savings in July 1989, and (2) a copy of a form that may have been executed when the mortgage was opened, which shows the applicable interest rate and the schedule of payments due under the contract.  Mr. Lewis did not send, although CSC had a complete file on the foreclosure in its possession,

documentation explaining how the deficiency was calculated or documentation demonstrating that CSC was authorized to collect the debt.

On May 12, the attorney contacted Mr. Lewis again, explaining that thirty days had elapsed without an adequate response to the Sepulvados' request for documentation of the loan and CSC's right to collect. Around that time, CSC sent one additional document. The source of this document is not immediately clear. However, it reflects that the Sepulvados' outstanding balance at the time of foreclosure was $48,333.65, and that University Savings received a bid on the property of $45,000. Whatever else it may have proved, that documentation did nothing to establish the validity of a $12,333 deficiency on the Sepulvados' property.

VI.   The Lawsuit

The Sepulvados brought this suit pursuant to the Fair Credit Reporting Act, 15 U.S.C. § 1681 – 1681(t), alleging that the CSC entry made the basis of the ACT entry was inaccurate and misleading. Specifically, the Sepulvados claimed that CSC failed to maintain reasonable procedures to assure "maximum possible accuracy" in its report, in violation of 15 U.S.C. § 1681e(b), failed to comply with the statutory procedure for reinvestigating the accuracy and completeness of an entry, in violation of 15 U.S.C. § 1681i, and failed to provide adequate documentation concerning the entry when requested, in violation of 15 U.S.C.

11

§ 1681g. The Sepulvados further claimed that CSC's negligent violation of the Fair Credit Reporting Act caused them to lose the opportunity to buy their dream home, which resulted in mental anguish and will cause them to pay a higher interest rate if they ever choose to buy another home.

After the matter was tried to the bench, the district court entered judgment in favor of the Sepulvados. CSC appealed. On appeal, CSC argues that the district court unfairly held it liable on the basis of language that appeared in the ACT report, but not the CSC report. CSC also claims that its own report was neither inaccurate nor misleading, and that the district court's award of damages was not supported by sufficient evidence.

The Sepulvados respond that CSC's report was inaccurate because it failed to disclose that the $12,333 obligation assigned in 1994 actually arose in 1988. The Sepulvados also filed a cross-appeal, in which they argue that the district court erred by failing to award additional compensatory damages and punitive damages.

To the limited extent that our review requires a reconsideration of the district court's fact findings, our review is for clear error only. *Stevenson*, 987 F.2d at 292. We review the district court's conclusions of law de novo. *Hammack v. Baroid Corp.*, 142 F.3d 266, 270 (5th Cir. 1998).

12

## CSC'S LIABILITY

The Fair Credit Reporting Act requires "consumer reporting agencies [to] adopt reasonable procedures for meeting the needs of commerce for consumer credit . . . in a manner which is fair and equitable to the consumer." 15 U.S.C. § 1681. The Act defines a complex set of rights and obligations that attend the relationships among and between the provider of a credit report, the user of that information and the consumer who is made the subject of such a report. The Act also provides remedies for negligent or willful failure to comply with the requirements of the Act. *See* *id.* §§ 1681n, 1681o.

The district court based its finding of liability upon § 1681e(b). Section 1681e(b) provides that a consumer reporting agency must use "reasonable procedures to assure maximum possible accuracy" when *preparing* a consumer report. *Id*. § 1681e(b); *see also* *Pinner v. Schmidt*, 805 F.2d 1258, 1262 (5th Cir. 1986) (Section 1681e(b) "imposes a duty of reasonable care in the preparation of a consumer report."). A credit entry may be "inaccurate" within the meaning of the statute either because it is patently incorrect, or because it is misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions. *See* *Pinner*, 805 F.2d 1258 (finding violation of § 1681e(b) where, notwithstanding consumer reporting agency's actual knowledge of the true facts, it marked a credit entry

13

"litigation pending" without specifying that it was the plaintiff/obligor who had initiated suit against the creditor). But the Fair Credit Reporting Act does not impose strict liability for inaccurate entries. Rather, the plaintiff must show that the inaccuracy resulted from a negligent or willful failure to use reasonable procedures when the report was prepared. *Thompson v. San Antonio Retail Merchants Assoc.*, 682 F.2d 509, 513 (5th Cir. 1982).

The district court concluded that CSC failed to use reasonable procedures when preparing the entry that reflected the $12,333 deficiency. The district court first found that CSC's consumer report was, in all material respects, correct. The district court concluded, however, that CSC's report was incomplete because it did not reveal (1) that University Savings was the original debtor on the assigned obligation, and (2) that the "assigned" debt dated back to a 1988 mortgage foreclosure. The district court further concluded that CSC's failure to include these details about the assigned debt rendered the CSC report so misleading that it was "inaccurate" within the meaning of the statute. Finally, the district court concluded that the inaccuracy was caused by CSC's failure to adopt reasonable procedures because CSC could have easily eliminated any ambiguity by simply supplying additional information about the nature of the $12,333 entry.

14

We disagree.  CSC's report may have been incomplete, but it was not, as the district court found, facially misleading or inaccurate when prepared.  CSC's use of the term "assigned" (as compared to the phrase "open date" in ACT's report) would have placed a creditor on notice that the obligation existed before the March 1994 assignment date.

The Sepulvados attempt to support the judgment by arguing that completeness, as a principle separate and apart from whether a particular entry or report is misleading, may also lead to liability under § 1681e(b).  In support of that proposition, the Sepulvados cite *Koropoulos v. Credit Bureau, Inc.*, 734 F.2d 37 (D.C. Cir. 1984).  While it is true that *Koropoulos* recognizes completeness as an aspect of accuracy under § 1681e(b), that case also suggests that only a truly extraordinary case would justify liability on the basis of an incomplete, but not misleading, credit report.  *See id*. at 45.  Indeed, *Koropoulos* states that it may often be a reasonable procedure within the meaning of the Act to rely upon the potential creditor or the credit applicant to supply information that is alleged to have been omitted from a credit entry that was incomplete, but otherwise accurate, when it was prepared.  *Koropoulos*, 734 F.2d at 45.

We decline, at least in this case, to construe § 1681e(b) in a way that would require completeness without regard to whether the disputed entry was misleading.  To frame the issue this way would

15

require the Court to choose in this case between a rule that consumer reporting agencies may not report an assignment or secondary collection effort without independently investigating and then reporting on the details of the underlying obligation, and a rule that they are always excused from doing so. Such an approach ignores both the statutory balance adopted in the "reasonable procedures" language of § 1681e(b) and the effect of other statutory procedures, which are intended to govern the resolution of a consumer dispute about the content or completeness of an entry. *See generally* 15 U.S.C. § 1681i. We hold that CSC did not negligently fail to follow reasonable procedures when preparing the credit entry that reported the $12,333 deficiency.[8] Therefore, CSC

---

[8] At trial, the Sepulvados claimed both that the CSC entry was inaccurate, in violation of § 1681e(b), and that CSC failed to respond appropriately once they registered their disagreement with the content of the entry, in violation of certain provisions of § 1681i and § 1681g of the Fair Credit Reporting Act. *See id.* § 1681i(a)(5) (requiring the agency to promptly delete or modify information that is unverifiable or incomplete); *id.* § 1681i(a)(3) (requiring the agency to provide written notice concerning the disposition of the dispute within five days); *id.* § 1681i(a)(6) (requiring written notice of results of reinvestigation); *id.* § 1681i(a)(6)(B)(iv) (requiring the agency to provide notice that the consumer has the statutory right to supplement the disputed information with the consumer's own statement disputing the accuracy or completeness of the report); *id.* § 1681i(b) & (c) (permitting the consumer to supplement the entry with a statement setting forth the nature of the dispute); *id.* § 1681i(c) (requiring that the consumer's own statement be carried forward with the entry). The district court found that the Sepulvados failed to prove a violation of § 1681i or § 1681g, and that CSC was entitled to judgment as to those claims. On appeal, the Sepulvados have failed to brief, and therefore abandoned, any claim that the district court's disposition of their claims under § 1681i or § 1681g is error. *See, e.g., MacArthur v. University of Texas Health*

16

did not violate § 1681e(b) of the Fair Credit Reporting Act. Without liability there can be no damage award, and we need not review those damage issues raised by CSC on appeal and by the Sepulvados in their cross-appeal.

For the foregoing reasons, the district court's judgment in favor of plaintiffs Edward C. and Sheree D. Sepulvado is REVERSED, and judgment is RENDERED in favor of defendant CSC Credit Services, Inc.

REVERSED AND RENDERED.

---

*Ctr.*, 45 F.3d 890, 895 (5th Cir. 1995). We therefore express no opinion concerning whether CSC's conduct once the Sepulvados registered their disagreement with the content of the entry violated the Fair Credit Reporting Act.